**CARRELL'S 287 AUTO TRUCK STOP,**
**Appellant,**

v.

**Robert W. LUCAS, Appellee.**

**No. 7855.**

Court of Civil Appeals of Texas.

Amarillo.

June 17, 1968.

Rehearing Denied Sept. 3, 1968.

————◆————

Simpson, Adkins, Fullingim & Hankins, Amarillo, for appellant; Michael C. Music, Amarillo, of counsel.

Monning & Monning, Amarillo, for appellee; Robert R. Bradshaw, Amarillo, of counsel.

NORTHCUTT, Justice.

Robert W. Lucas brought this suit for damages to his truck as a result of the installation of an oil filter. Suit was against the retailer, Carrell's 287 Auto Truck Stop, based on strict liability in tort, and against the manufacturer, Purolator Products, Inc., based on strict liability and alternatively on negligence. An interlocutory default judgment was taken against the retailer. The trial court, after a hearing, overruled retailer's motion to set aside the judgment and granted the plaintiff's non-suit as to the manufacturer. From that order overruling the motion the retailer perfected this appeal. Hereinafter Carrell's 287 Auto Truck Stop will be referred to as appellant and Robert W. Lucas as appellee.

The appellant did not file an answer in the case before the judgment was rendered against it and brought this action to set aside the default judgment and grant appellant a new trial. The real issue here is whether the court erred in refusing to set aside the judgment and grant the appellant a new trial. It is appellant's contention that the action of the court in refusing the appellant a new trial constituted an abuse of the court's discretion; that the court erred because such ruling was dependent upon an implied finding that appellant's failure to timely answer was intentional or the result of conscious indifference and that there was no evidence of probative force to support such implied finding; that the court erred in that such finding was dependent upon an implied finding that appellant's failure was not the result of an accident or a mistake and there was no evidence of probative force to support such finding; that the court erred because such ruling was dependent upon an implied finding that appellant failed to represent a meritorious defense to the cause of action and there was no evidence of probative force to support such implied finding; that the court erred because such ruling was dependent upon an implied finding that to grant such motion would cause the delay or otherwise work an injury to appellee and that there was no evidence of probative force to support such implied findings and that there was insufficient evidence to support such findings.

The original suit was filed on August 23, 1967, and on August 31, 1967, Mr. Hansard was notified by letter to refer the file to the attorney if the carrier of Purolator Products was not willing to settle as suggested in the letter. In seeking to have the judgment set aside and a new trial granted the appellant pleaded as a reason for not filing an answer before the judgment was extended as follows:

"The sole reason that no answer was filed on behalf of NOLAN WAYNE CARRELL prior to judgment being entered was that JACK HANSARD as a

result of his understanding of an agreement with Bradshaw was mistaken as to the time judgment, if any, would be entered. But for Hansard's mistake as to this agreement that he had with Bradshaw, Hansard would have filed an answer to this suit on or before September 27, 1967."

■ The ruling as to setting aside a default judgment and a new trial ordered has been definitely determined in this state. It is stated in Craddock v. Sunshine Bus Lines, Inc., 134 Tex. 388, 133 S.W.2d 124 as follows:

"Trial judges desire and are entitled to have a principle or rule to guide them, and we, therefore, reannounce, in slightly changed language the rule established by the above authorities, as follows: A default judgment should be set aside and a new trial ordered in any case in which the failure of the defendant to answer before judgment was not intentional, or the result of conscious indifference on his part, but was due to a mistake or an accident; provided the motion for a new trial sets up a meritorious defense and is filed at a time when the granting thereof will occasion no delay or otherwise work an injury to the plaintiff. This is a just rule. It prevents an injustice to the defendant without working an injustice on the plaintiff. Such a rule has the sanction of equity."

This same rule was again affirmed by the Supreme Court in Ivy v. Carrell, 407 S.W. 2d 212.

On cross examination by appellant's attorney, Mr. Hansard was asked when was the first time he ever had any contact with Mr. Bradshaw in regard to the claim here in question and he answered he didn't know the exact date but was after appellant had denied the claim. Mr. Hansard, an interested witness, further testified when questioned by Mr. Bradshaw in part as follows:

"Q. There was a delay in the Defendant Carrell's Truck Stop filing an answer to the suit that was involved, right?

A. Right.

Q. Now, as stated in your affidavit, you say that the reason for this delay was so that you on behalf of your insurance company and on behalf of Carrell's Truck Stop could negotiate a contribution by Purolator Products, isn't that right?

A. Yes, that was the intention, yes.

Q. All right. Who did you talk to about this contribution?

A. You mean before?

Q. Who with Purolator did you talk to? You stated in your affidavit you talked to the Purolator Distributor?

A. Well, now, we talked to two or three of them when the thing first started; I talked with Scurlock and then they turned it over to Cowan Claim Service.

Q. All right, let me refer to your affidavit. On Page 2 of your original affidavit you say that, 'From the conversation', that is the conversation between you and me, 'It was Hansard's understanding that no further action will be taken in regard to this suit until Mr. Hansard had an opportunity to contact Purolator and determine the position that they were going to take,' and then later on you say, 'While he thought negotiations'—that is you, 'while he thought negotiations were still open,' and I presume that was negotiations with Purolator.

A. Uh-huh (yes).

Q. All right. Who with Purolator?

A. Well, it was with—before the thing was filed I talked to Don Tuttle and with Cowan Claim Service—well, I talked to Scurlock and he told me that Cowan Claim Service had it. So, I talked to Don Tuttle, that was back about the middle of August some time and he said that he had just gotten the file and he didn't have any investigation under it yet, and, of course,

we discussed it back and forth since we had already denied it and everything on our part at that time whether or not I could help him any since we would probably be brought in the suit together; he said well, he didn't know and I asked him if they would be willing to pay part of it and he said he didn't know, didn't have enough information at that time and that as soon as he got a hold of his company and investigation, well he would know more about it and would let us know something then and then in—

Q. Well, you don't say that you had any agreement with Don Tuttle then whereby—

A. Only that he was to let us know, he didn't know anything about it at the time, he was going to—

Q. Well, what did he agree to do?

A. He just said he would check with Purolator and see their position on it.

Q. He would check with Purolator?

A. Yes, or his home office or check, he said he would check on it and see.

Q. Did you talk to anyone else representing Purolator—

A. No, that was—

Q. About Purolator paying part of it? Isn't this the essence of what you say in your affidavit that you were trying to get Purolator to pay part of it?

A. Yes, our company said they would be willing to pay some if Purolator would pay some.

Q. And the reason for this delay so if you could see if Purolator was going to pay part of it?

A. Right.

Q. But Don Tuttle never said that he was recommending that Purolator pay part of it, did he?

A. No, he didn't, at the time I talked to him he didn't know; he didn't have enough investigation, he had just gotten the file and—

Q. But that's all that was said between you and Don Tuttle at that time?

A. Yes.

Q. And you didn't have any agreement with the local Purolator Distributor to the effect that Purolator was going to pay part of it?

A. No, he turned it over to—he told me he didn't have authority to make that decision.

Q. But you mentioned in your affidavit, don't you, that your negotiations with the Purolator Distributor?

A. I don't know if it was a Distributor or a Representative, but Tuttle was the one I talked to, I don't know how it's worded for sure, I can't remember that one now.

Q. All right, you talked to me once on July 31st, 1967. Now, this was before the suit was filed; we talked about that date, didn't we, on the telephone?

A. I don't know the date but I know we talked—

Q. Well, it was about that time wasn't it, and you told me at that time that Mr. Scurlock had told you that Purolator was going to deny liability, didn't you?

A. Right, we had denied it ourselves, too.

Q. And that was as far back as July 31st, wasn't it?

A. Well, I don't know, I don't know the time.

Q. Well, it was about the time, wasn't it?

A. Well, it was around sometime—

Q. And it was certainly before the suit was filed, wasn't it?

A. That particular—yes."

* * * * * *

"Q. The last time you talked to Don Tuttle was in the middle of August, wasn't it, you said—

A. Around the middle of August.

Q. It would have been about August 15th, something like that?

A. Well, I couldn't pin it down, any date.

Q. Well, could you pin it down within a week either way?

A. The only thing I know I believe I have got a letter in the file that I wrote to the company and I wrote the letter on August the 15th, where I told them that we had contacted Don Tuttle.

Q. Then, you talked to Don Tuttle before August 15th, then?

A. Yes, sometime before August 15th.

Q. Did you ever talk to him after that?

A. Not on this case here, no.

Q. So, after August 15th the only one that you talked to about this case was me you say?

A. Yes."

* * * * * *

"Q. What about the citation, did I say I was going to issue citation?

A. I don't remember anything about a citation. The only thing I remember about a citation was the first time we talked well, you said that—

Q. Well, of course, we are talking now about the conversation of August 30th or September 1st.

A. No. I don't remember anything about a citation.

Q. And you just said on that date I never remember a thing about my filing suit, I never said anything about that?

A. You never said anything about filing suit on that date, on the—at that time we were talking about our negotiations.

Q. Okay. And that was on this conversation that you have said in the affidavit on August 30th and September 1st, isn't it?

A. Yes.

Q. Okay. You said that I agreed to delay requiring you to file an answer?

A. No, I didn't say that you agreed to delay.

Q. All right, what did I say?

A. I said that I—it was my understanding—I guess I could have misunderstood you."

Mr. Tuttle testified in part as follows:

"Q. Do you know Jack Hansard of Hopson Claim Service?

A. Yes.

Q. Did you ever talk to him about this case?

A. One time.

Q. When was that?

A. Shortly after I took the file over.

Q. All right, what was said on this occasion?

A. I merely called him and as I recall the situation, I called and he was out and he returned the call; I notified him that we were representing Purolator and that our investigation was not as yet complete and that as we saw it, I didn't see any liability on Purolator and that was about the extent of the conversation as I recall.

Q. Can you pinpoint this date a little bit more closely, was it before or after you and I had the conversation on about August 22nd?

A. It was before that time, sir.

Q. About how long before?

A. Oh, maybe a week, ten days, two weeks.

Q. So, it was some time in the—

A. Early part—

Q. First part of August, would that be correct?

A. Yes.

Q. Did Mr. Hansard say anything to you to the effect that Pan American who is Carrell's insurance company was going to pay part of it if your company would pay part of it?

A. He mentioned that there was some indication by his company to a payment up to $700.00.

Q. Was there anything said, anything left open that you should get in touch with him, anything to that effect?

A. My investigation wasn't complete and I couldn't make any commitment.

Q. All right. Was there anything said about you getting in touch further with Mr. Hansard?

A. Not that I recall.

Q. Was there anything contingent about an agreement, anything of a binding nature about we will pay part of it if you will pay part of it?

A. No.

Q. Was there anything said that would place any obligation on you to do anything further as far as Hansard is concerned, to get in touch with him again, to give him notice or to do anything like that?

A. No, to go further when I found out—when our company told us to deny liability, which I did to you, and then you told me that suit was filed or was being filed, my obligation was ceased.

Q. And after you talked to me you didn't do anything about the case after that?

A. Except—no, I just closed my file, I told you that we felt there was no liability and if suit was filed, fine and dandy, we would defend.

Q. All right, sir. Since this time early in August when you talked to Mr. Hansard have you talked to him since?

A. No."

Mr. Bradshaw in part testified as follows:

"Now, as to the phone call that allegedly took place on August 31st or September 1, I absolutely, unequivocally deny that any such phone call ever took place."

Mr. Bradshaw further testified he knew and was certain he never had at any time any conversation with Mr. Hansard after the suit was filed until after judgment was entered.

It is stated in Anchor Casualty Co. v. Bowers, 393 S.W.2d 168 by the Supreme Court as follows:

"Recently we stated that the uncontradicted testimony of an interested witness cannot be considered as doing more than raising an issue of fact. An exception is made when the testimony of the interested witness is clear, direct, and positive, and there are no circumstances in evidence tending to discredit or impeach such testimony. Great American Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41 (Tex.Sup.1965). There are circumstances in evidence tending to discredit or impeach Bowers's testimony."

Under this record, we think the trial court was justified in holding that the failure of appellant to file an answer was the result of conscious indifference on the part of Mr. Hansard and was not due to a mistake or an accident. Judgment of the trial court is affirmed.

DENTON, C. J., respectfully dissents.