Alice Faye **DUNN** et al., Appellants,

v.

**R. M. STEPHENS** et al., Appellees.

No. 17178.

Court of Civil Appeals of Texas.

Dallas.

Dec. 6, 1968.

Rehearing Denied Jan. 3, 1969.

Robert H. Fields, of Fields & Hardee, Athens, for appellants.

John H. Minton, Jr., of Spruiell, Lowry, Potter, Lasater & Guinn, Tyler, Hugh L. Steger, of Storey, Armstrong & Steger, Dallas, for appellees.

DIXON, Chief Justice.

This is an appeal from a summary judgment in favor of defendants, appellees here, in a suit in which the plaintiffs, appellants here, sought recovery of exemplary damages.

The suit was brought by Alice Faye Dunn, surviving widow of Earnest Nebraska Dunn, and by Dunn's heirs at law pursuant to Art. 16, § 26, of the Constitution of Texas, Vernon's Ann.St., and Articles 8306, Sec. 5, and 4673, Vernon's Ann. Civ.St. Workmen's Compensation benefits have already been paid.

In one point on appeal appellants attack the summary judgment on the ground that the record discloses fact issues as to gross negligence and proximate cause on the part of appellees.

Earnest Nebraska Dunn was killed when he was run over by a winch truck driven by appellee R. M. Stephens, construction superintendent for appellee Robert J. Sabinske, who does business as National Development Company. Appellees were engaged on grading and excavating work in connection with a lakeside resort development close to Cedar Creek Lake in Henderson County.

Suit was originally filed in Henderson County. Stephens and Sabinske filed pleas of privilege seeking to have the cause transferred to Dallas County for trial. The trial court overruled their pleas, but on appeal the Tyler Court of Civil Appeals reversed the trial court's judgment and ordered the cause transferred to Dallas County. Stephens v. Dunn, 417 S.W.2d 608 (Tex.Civ.App., Tyler, 1967, no writ).

Appellees contend that the determination of the issues in the venue proceedings constitutes the law of the case with respect to the summary judgment here on appeal, and is determinative of the facts here involved. We do not agree with appellees for two reasons.

1. In venue hearings where the plaintiff relies on Art. 1995, Subd. 9a, V.A. C.S., the statute itself recites that the burden is on the plaintiff to prove that the alleged act of negligence occurred in the county of suit and that it was a proximate cause of plaintiff's injuries. Conflicts in the evidence raising fact issues are to be determined by a preponderance of the evidence.

In summary judgment proceedings, on the other hand, the burden is on the moving party, whether he be plaintiff or defendant, to show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. All doubts as to the existence of a genuine issue of fact must be resolved against the movant. Conflicts in the evidence will be disregarded and the court will accept as true all evidence of the opposing party which tends to support such party's contention. Rule 166-A, Vernon's Texas Rules of Civil Procedure; Great American Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41 (Tex. Sup.1965); Tigner v. First Nat. Bank of Angleton, 153 Tex. 69, 264 S.W.2d 85 (1954).

2. Additional evidence, not presented at the venue hearing, was adduced at the hearing on the motion for summary judgment in the form of an affidavit by Lloyd Dyess, who swears that he witnessed the tragedy.

On the occasion when Dunn was fatally injured Stephens and a crew of helpers were digging a channel to be connected with the lake. This channel was to be 100 to 125 feet wide and 10 feet deep. It was to be a finger of the lake with home

sites fronting on it so that home owners would have easy access to the lake waters for the launching of boats and other purposes. The channel had been about half finished.

Dunn had been hired by Stephens about two weeks earlier to operate a bulldozer. While he was driving on a slope of the channel the machine jumped its track. It was decided to use the winch truck to pull the bulldozer back on its track. But the motor of the winch truck died and would not start again due to battery trouble. Two tractors were then called into action. Chains were attached to the truck and it was towed a sufficient distance to start its engine. Dunn then detached the chains from the truck and was walking up the slope carrying the chains.

Stephens meantime had started backing the truck up the slope and had swerved in order to turn the vehicle around. It was then that the truck ran over Dunn. Another employee of Sabinske's, Lloyd Dyess, says he shouted to Stephens that he had run over a man. Stephens says he did not hear Dyess. Somehow in operating the truck Stephens ran over Dunn a second time. Dunn died about thirty minutes later before reaching a hospital.

The record before us consists of the pleadings, depositions, the statements of facts prepared for the appeal in the venue case, and the affidavit of Lloyd Dyess. Neither Stephens nor Sabinske filed affidavits in support of their motion for summary judgment.

The affidavit of Dyess contains additional evidence which was not presented in the venue hearing. We quote from the affidavit:

"Ernie Dunn was killed on the west slope of one of the channels, when R. M. Stephens, while backing up the slope, backed over Ernie Dunn with the back dual wheels of a truck being used on the project and owned by Mr. Sabinske. On the day that Ernie Dunn was killed, he had been operating a bulldozer and had thrown the track. We were going to use the truck which ran over Ernie Dunn in order to get the track back on the bulldozer. The truck was in the bottom of a channel runing north and south. The channel was sloped upwardly at about a 45 degree angle. The bottom of the channel was approximately 40 feet wide. The slope on the west side of the channel was 30 to 40 steps. Ernie Dunn was killed seven steps down from the top of the slope.

The last few days before Ernie Dunn was killed, R. M. Stephens cursed him quite a bit in front of me and the other workers. A day or two before the accident Ernie Dunn and I were sitting around eating our lunch when out of the clear blue R. M. Stephens told him 'if you would shut your God damn mouth, you might get more work done.' R. M. Stephens acted like he was mad because Ernie was saying anything to his fellow employees and seemed to me like he held a grudge against Ernie. Two or three days before the accident, R. M. Stephens told me that he was firing Ernie."

\*    \*    \*    \*    \*    \*

"After we got it started, Ernie Dunn unhitched the chains with which we pulled the truck from the truck and tractor and started carring the chains up the west slope of the channel toward a pickup. I pulled my tractor up and parked it. Ernie Dunn had put the chains, one end on his shoulder and one end in his hand, and had started up the slope on an angle sort of in a southwesterly direction from the truck. The truck at that time was headed in a northerly direction. I was standing on the tractor when R. M. Stephens started backing the truck up. He revved the motor up and it was making a loud noise. He suddenly started backing the truck in a southerly direction and then suddenly cut the truck to his left, backing the truck up the slope on the west side of the channel toward Ernie Dunn, and backed the truck over Ernie Dunn and killed him. R. M. Stephens backed the truck 16 steps then

cut it straight up the slope. I saw the truck run over Ernie Dunn. When the truck first hit him, it caught his left foot under the wheel. It had his foot and leg under the wheel when I hollered to R. M. Stephens and waved to him to wait. The truck rolled, kicked him under, the wheels kicked him under the body of the truck. The wheels pulled him under the truck and the truck bounced up and down on him several times there before it kicked him under the truck. R. M. Stephens was driving the truck at the time and he was sitting there on that slope with the truck wide open bouncing it up and down trying to back it up. He was in reverse gear when the wheels were jumping up and down. The left rear dual wheels were on Ernie Dunn. I hollered and waved at R. M. Stephens that he had run over the man, but he did not stop. After the truck kicked Ernie Dunn underneath the truck, R. M. Stephens let the truck go forward, dragging Ernie Dunn down the slope, the differential caught him on his shoulder and rolled him over on his right side and his face was on the ground when I got to him. I went to him immediately. R. M. Stephens did not stop the truck until he went to the bottom of the slope. I was the first person to the body of Ernie Dunn. I had gotten Ernie out from under the truck before R. M. Stephens even got out of the truck, in fact I had to tell R. M. Stephens to run bring some water to wash Ernie Dunn's face a couple of times before he even would move. * * * It sounded to me like the truck was wide open when R. M. Stephens started backwards with the truck. I thought he was going to back the truck straight down the channel back to the dozer where it had been prior to our pulling it off to get it started. There was no reason for him to turn the truck up the west slope."

*   *   *   *   *   *

"It took the ambulance about 35 to 40 minutes to arrive. Mr. Dunn was dead when the ambulance arrived. I was holding him when he died. When the ambu-lance arrived, R. M. Stephens and I loaded him on the ambulance and the ambulance hauled his body away. As the ambulance was leaving, R. M. Stephens said, 'The son of a bitch is better off dead than he would be alive; he would have killed some-body with the equipment.' He spoke these words to me. On the day of the accident, immediately before the accident, R. M. Stephens appeared to me to be upset and mad at Ernie Dunn because he did not like the way Ernie was operating the equip-ment. He was jerking and slambanging and sort of in a fit of rage. He had said that he was going to fire Ernie.

The truck tracks on the slope at the spot where Ernie Dunn was killed were plain on the ground; however, R. M. Stephens bladed them off after the ac-cident.

*   *   *   *   *   *

"The area at the bottom of the channel was tolerably flat and there was enough room to turn the truck around without backing it up the slope on which Ernie Dunn was killed. There was also nothing to prevent the truck from being backed up the opposite slope, had R. M. Stephens done so. I had occasion to turn the truck around in the ditch the next couple of days after the accident. I saw R. M. Stephens at the time the truck was on Mr. Dunn's foot. His left door was open and he was looking straight at me when I hollered for him to stop that he was running over Mr. Dunn. His left door was standing wide open and he was looking north toward me and was looking away from where Ernie Dunn was. I did not see R. M. Stephens look back toward the way he was backing at any time. * * * As soon as I saw that R. M. Stephens had run over Ernie Dunn with the truck, I immediately ran to Ernie Dunn and was the first one to him. R. M. Stephens did not state to Ernie Dunn, 'Ernie, I wouldn't have this happen for anything in the world.' And Ernie Dunn did not state to R. M. Steph-ens, 'I know it, Steve. You couldn't help

it.' Ernie Dunn did state to me, 'Why did he do it?'"

At the venue hearing in Henderson County Dyess admitted that a day or two after the fatal occurrence Stephens and Sabinske visited the scene of the tragedy and he, Dyess, told them he had not seen the truck run over Dunn. This unsworn statement is contrary to his testimony and to his affidavit. In explanation of this inconsistency Dyess testified as follows:

"Q Mr Dyess, do you recall the occasion when you went back out to the scene of this accident with Mr. Sabinske, sitting here, you do know Mr. Sabinske?

A Yes, sir, I met him a couple of time.

Q And Mr. Stephens?

A Yes, sir.

Q And Mr. Hammer?

A Yes, sir."

\* \* \* \* \* \*

"Q Do you recall being asked whether you saw the accident?

A I do.

Q Do you recall that you said you had not? Did you say that, Mr. Dyess?

A At the time, yeah, I did.

Q All right, sir, which time are you telling the truth, then or now?

A Now.

Q Why didn't you tell it then?

A Well, one reason, I didn't want to see no trouble happen.

Q What trouble did you expect, Mr. Dyess?

A Well, you know, anyone get run over or a killing or anything like that, it could lead to something else.

Q You just wanted to stay out of it?

A That's right.

Q What changed your mind? Who have you talked to since then that changed your mind?

A I decided to tell the truth about it."

In weighing conflicting statements by the same witness it should be borne in mind that such conflicting statements raise fact questions. Western Union Telegraph Co. v. Coker, 146 Tex. 190, 204 S.W.2d 977 (1947); 24 Tex.Jur.2d 369 (Note No. 15).

 Applying the principles enunciated by our Supreme Court in the cases hereinbefore cited we have concluded that the record before us discloses material issues of fact in regard to gross negligence and a conscious indifference to the right and welfare of Earnest Nebraska Dunn. Accordingly, we sustain appellants' point on appeal.

The judgment of the trial court will be reversed and the cause remanded to the trial court for further proceedings.

Reversed and remanded.