**Archie McCORD, Individually and on behalf of his deceased Wife, Sarah McCord, Appellant,**

v.

**Dr. Jack W. AVERY, Appellee.**

No. 2–85–158–CV.

Court of Appeals of Texas, Fort Worth.

May 15, 1986.

Gibbens, Burrow & Bratton and R. Louis Bratton, Austin, for appellant.

Cantey, Hanger, Gooch, Munn & Collins and Richard L. Griffith and Stephen L. Tatum, Fort Worth, for appellee.

Before FENDER, C.J., and BURDOCK and HILL, JJ.

OPINION

FENDER, Chief Justice.

This is a medical malpractice case brought by appellant Archie McCord, individually and as representative of his deceased wife, Sarah McCord, against appellee, Dr. Jack Avery. The trial court rendered a summary judgment that appellant take nothing against appellee. The summary judgment proof consisted of the depositions of Dr. Avery, Archie McCord and Dr. Robert Capper and some of Mrs. McCord's medical records, although the medical records are not included in the record on appeal. There were no interrogatories, requests for admissions, affidavits nor other summary judgment proof.

We reverse and remand.

Sarah McCord, age 55, had been under the care of Dr. Avery since 1977. She had a history of heart trouble as noted in Dr. Avery's records. He noted an enlarged heart with irregular rhythm. In April of 1980, Dr. Avery sent McCord to Dr. Osborn, a cardiologist and one of Dr. Capper's partners. Dr. Osborn classified McCord as being totally disabled because of her heart problems when he began treating her. Her condition later improved. She was receiving several different medications, including: Norpace to control premature heartbeats; Lanoxin to control and stabilize the atrial fibrillation; Lopressor to control high blood presure; Lasix, a diuretic; and Slow K as a supplement with Lasix to prevent potassium imbalance.

In February of 1981, McCord returned to Dr. Avery complaining of abdominal pain, nausea, bloating and tenderness. Dr. Avery diagnosed gallbladder problems which required surgery to cure. Although the surgery was necessary, it was not an emergency situation. Dr. Avery called it "elective surgery." At the time of the surgery, McCord was five feet, four inches tall and weighed 196 pounds. An electrocardiogram (EKG) taken February 17, 1981

showed atrial fibrillation. The pre-surgery examination EKG also showed continuing atrial fibrillation as well as indications of a prior inferior wall infarction. Dr. Avery testified in his deposition that he called Dr. Capper's office to ask Dr. Capper to be responsible for following McCord and managing all heart medications during and after surgery. Additionally, he left written orders for the nurse to call Dr. Capper's office and have one of them order post-operative heart medications. Neither Dr. Capper nor anyone else from his office ever saw McCord after her surgery nor prescribed any medication. Accordingly, there were no entries in her hospital chart or physician's notes reflecting blood gas tests, EKG, or medications for her heart.

The gallbladder surgery was performed in Harris Hospital Methodist on March 4, 1981. McCord remained in the recovery room overnight without any type of heart monitor. She was subsequently moved to a standard room with no EKG equipment.

On March 5th, the day after surgery, Dr. Avery ordered Lanoxin intramuscularly. In his deposition, Dr. Avery stated that he knew Dr. Capper had not yet shown up but expected him to show up later. An oral dose of Lanoxin was ordered by Dr. Avery for March 6th. From the sketchy record before us, McCord was not, at any time after surgery, receiving any of her other medications she had been taking prior to surgery. On the third post-operative day, she suffered a cardiac arrest. Brain damage resulted before she could be resuscitated and she remained in a coma until her death. An autopsy ruled out several possible causes for McCord's cardiac arrest but could not pinpoint the exact cause. Dr. Capper testified to several possible causes including "sudden de novo ventricular fibrillation" brought about by: her underlying heart disease; digitalis excess (possibly from too much Lanoxin); or metabolic derangements such as too much or too little potassium.

Appellee moved for summary judgment, on two grounds: 1) that there is a basic presumption that Dr. Avery performed his duties properly and 2) that he did not breach the applicable standard of care.

The response to the motion for summary judgment stated that: 1) the presumption appellee alleges is applicable does not apply in summary judgment cases and 2) appellee's failure to monitor McCord's heart and to conduct blood tests relating to heart-related blood chemicals showed substandard conduct.

The trial court granted the motion for summary judgment on all grounds alleged in the motion. On appeal, appellant contends generally that it was error to grant the motion for summary judgment. In his argument, he is more specific and reasserts the same two contentions he asserted in the trial court concerning: 1) the presumption and 2) his belief that Dr. Avery's negligence in failing to monitor McCord's heart and to test her blood is apparent in the summary judgment record.

In a summary judgment case, the issue on appeal is whether the movant met his burden for summary judgment by establishing that there exists no genuine issue of material fact and that he is entitled to judgment as a matter of law. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 (Tex.1979); TEX.R. CIV.P. 166–A. The burden of proof is on the movant, and all doubts as to the existence of a genuine issue as to a material fact are resolved against him. *Great American Reserve Insurance Company v. San Antonio Plumbing Supply Company*, 391 S.W.2d 41, 47 (Tex.1965). Therefore, we must view the evidence in the light most favorable to the non-movant. *Id.* In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence will be disregarded and the evidence favorable to the non-movant will be accepted as true. *Montgomery Ward v. Kennedy*, 669 S.W.2d 309, 311 (Tex.1984); *Farley v. Prudential Insurance Company*, 480 S.W.2d 176, 178 (Tex. 1972). Every reasonable inference from the evidence must be indulged in favor of the non-movant and any doubts resolved in his favor. *Montgomery Ward*, 669 S.W.2d at 311. Evidence which favors the movant's position will not be considered unless it is uncontroverted. *Great American*, 391

S.W.2d at 47. If such uncontroverted evidence is from an interested witness, it cannot be considered as doing more than raising a fact issue, unless it is clear, direct, positive and free from inconsistencies and contradictions. *Id.* The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of his cause of action or defense as a matter of law. *City of Houston,* 589 S.W.2d at 678.

■ We find that appellant is correct in his assertion that the presumption that a doctor has properly carried out his duties is not applicable in a summary judgment case. *See Missouri, Etc. v. City of Dallas,* 623 S.W.2d 296 (Tex.1981). This is because the requisite facts for summary judgment must be affirmatively established. *See Castillo v. American States Ins. Co. of Texas,* 550 S.W.2d 408, 409 (Tex.Civ.App.—Dallas 1977, no writ).

Even though the trial court erred in granting summary judgment based on that ground, we still must determine whether the trial court erred in granting summary judgment on the other ground raised in appellee's motion: that the summary judgment proof conclusively showed that Dr. Avery performed his duties in accordance with the applicable standard of care. *See Malooly Brothers, Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970).

■ We note that because appellee was the movant, he had the burden of negating this element of appellant's cause of action that he is disputing: the breach of the standard of care/negligence. *See Gibbs v. General Motors Corporation,* 450 S.W.2d 827, 828 (Tex.1970). In other words, appellee had to prove that the applicable standard of care was not breached or that there was no negligence on his part. Because appellee had to prove that the standard of care was not breached, he obviously had the duty to tell the court what that standard is. *See Coan v. Winters,* 646 S.W.2d 655, 657–58 (Tex.App.—Fort Worth 1983, writ ref'd n.r.e.). This, he attempted to do through the deposition testimony of an expert: Dr. Capper. The following excerpt from the record shows appellee's attorney's efforts to pin Dr. Capper down to an answer as to whether he is aware of the applicable standard of care and whether it was breached by Dr. Avery:

Q [Appellee's attorney, Mr. Griffith]:

Are you, even though you are a cardiologist, are you generally aware of the existence of a certain minimal standard of care that would be performed by general practitioners in the Tarrant County area in the year 1981?

A [Dr. Capper]:

I'm aware of a standard of care and standards of practice in the institutions where I have the opportunity to witness these. And I guess another response is that all of the hospitals have ongoing peer review.

Q What hospitals—I think you told us about Harris—but what other hospitals would you have an opportunity to review the conduct and the standard of care exercised by general practitioners? And I should add to that general practitioners who perform surgery in the area hospitals?

A I wouldn't individually. The only reason I do with Harris is because I happen to be on the Credentials Committee. But I wasn't at that time.

Q But you have since served on credentials committees?

A Yes.

Q Rather than say watching them do surgery, just the general standard of care that would be required of a general practitioner with a patient in a hospital aside from surgery itself, just the ongoing follow-up care of a patient postoperatively. Would you be aware of that general standard exercised?

A Not necessarily.

Q I'll put it another way. Do you have any—

MR. BRATTON [Appellant's attorney]: I'm going to lodge an objection to your putting it another way. He's already said he doesn't know what the standards are for that type of doctor.

MR. GRIFFITH: Well, I think he did in a way and he didn't in a way. I might have confused him.

QUESTIONS BY MR. GRIFFITH:

Q What I'm looking for, Doctor, whether a physician is a general practitioner, an internal medicine specialist, or for that matter even a surgeon who has under consideration the care of a patient while interned in the hospital, or any area hospital, are there certain minimal standards of care that would be followed by any physician?

A Yes.

Q Exercising good medical practice in the Tarrant County area whether it be 1981, 1982 or here in 1984?

A Yes, there are.

Q And are you aware of those standards?

A Only as I'm aware of standards of good practice as related to patients in whom I come in contact.

Q And as far as my question goes I'm really, I guess what I'm really saying is whether you be a cardiologist or a general practitioner there are certain minimal things that a physician would do for a patient in an area hospital, wouldn't there be?

A I'm sure.

Q And certain things that you would not do as a physician whether you be a specialist such as a cardiologist or a general practitioner in the care and treatment of a patient?

A That's true.

Q All of that is a predicate for this question. In your review of Mrs. McCord's hospitalization in March of '81 do you find in the medical chart or the medical record that you reviewed in her care and treatment any medical treatment that was performed by Dr. Avery that would deviate from or depart from the standard of care, the minimal standard of care, that you have testified that would exist in 1981 in the Tarrant County community?

A No, I didn't find anything that was out of keeping with what I would expect to be the standard of care.

Q By the same token, in your review of that medical record do you find any omission on the part of Dr. Avery, that is, some medical treatment or care that he did not perform in the instance of Sarah McCord that should have been performed by one who was exercising this minimal standard of care that we are talking about?

A None that I could determine.

Q Speaking again, Doctor, in your position as a specialist and as a cardiologist do you find any evidence in the medical record that you have reviewed or any personal knowledge of your own about this patient that would lead you to believe that any medical treatment or failure to treat on the part of Dr. Avery caused or in any way contributed to her cardiac arrest?

A Not that I could determine.

We find that appellee failed to clearly state the applicable standard of care and so failed to meet his burden of proof. *See Coan*, 646 S.W.2d at 657–58.

The cause is reversed and remanded for trial on the merits.