**GREAT AMERICAN RESERVE INSURANCE COMPANY, Petitioner,**

**v.**

**SAN ANTONIO PLUMBING SUPPLY COMPANY, Respondent.**

**No. A–10159.**

Supreme Court of Texas.

April 21, 1965.

Rehearing Denied June 23, 1965.

Schulz & Hanna, Yates & Yates, Abilene, for petitioners.

Les Cochran, Abilene, for respondents.

Brundidge, Fountain, Elliott & Churchill, Dallas, for petitioner.

LeLaurin, Chamberlin, Guenther & Murry, Bettie J. Stock, San Antonio, with above firm, for respondent.

GREENHILL, Justice.

This is a suit by San Antonio Plumbing Supply Company, hereafter called SAPSCO, against Great American Reserve Insurance Company on a policy insuring the life of one of its officers, Sul Ross. Both parties filed motions for summary judgment. The trial court granted the motion of plaintiff, SAPSCO, and overruled that of defendant, Great American. Summary judgment was entered for the plaintiff. The Court of Civil Appeals reversed, holding that there was a disputed fact issue and that the trial court erred in granting the motion of SAPSCO. It also held that there was no error in overruling Great American's motion. The cause was remanded to the district court for a trial. 378 S.W.2d 141 (1964). Both parties applied to this Court for writ of error, and both applications were granted. SAPSCO complains of the reversal of its judgment, and Great American contends judgment should be rendered in its favor. We hold that there is no genuine issue as to any material fact and that Great American is entitled to judgment as a matter of law.

In November, 1961, Sul Ross, Martin Reinhard, and two others were officers of SAPSCO. They decided to take out "keyman" insurance on their lives for the benefit of the company. All four men executed applications for life insurance which were furnished to them by Darrell Barnes as agent for Great American. Each application, which was made a part of the policies, contained the following language:

"That the policy hereby applied for shall not take effect unless the insured is alive at the time of its delivery to the insured *provided* that if this application is approved by the company and policy issued as applied for, *and provided the first premium has been paid,* the insurance * * * shall be effective from the date of this application * * * and, provided further, that in no event, shall the insurance * * * take effect unless the insured is in sound health at the time of making this application."[1]

Ross's physical examination disclosed high blood pressure and excess sugar in his urine. Barnes, the insurance agent, sent the application and the results of the physical examination to Great American's home office at Dallas. From this information, the home office "rated up" Ross's policy. Four separate policies were prepared in Dallas and sent to Barnes with instructions to have each insured sign a declaration of no change in health as an amendment to the applications. These declarations read as follows:

" * * * I hereby declare that since my statements to the Great American Reserve Insurance Company which formed a part of my application for insurance dated 12/5/61, I have not had nor have I needed any medical advice; that there has been no change in my physical condition * * *; that I have had no physical examination revealing any unfavorable physical condition and have received no adverse opinion as to my health or physical condition * * *.

"The foregoing declaration is an amendment to and is hereby made a part of my said application, and I hereby understand and agree that it is material to the risk and that the Company, believing it to be true, will rely and act upon it.

| Witness | Signature of Applicant |
|---------|------------------------|

"This form must be properly completed and executed on any policy

---

1. Emphasis throughout opinion is supplied.

under which the full initial premium was not paid with the application. In event of change in health or occupation, the POLICY must be returned to the Home Office with this declaration."

Barnes received the four policies from Dallas on January 19, 1962, but took no action that day. The next day, January 20, he discovered that Ross was in the hospital. He had had a brain stem hemorrhage and was unconscious. Barnes went to see his unit manager, Ken Wingfield, who advised him:

"Go out and get a check and if Mr. Ross is actually in the hospital, of course, you can't let him sign the affidavit because he is not in good health * * *. We have got to hold the policy for instructions after he does get well and then we can go through the underwriting over again. Definitely get a check on these other fellows if they will give it to you and get their declaration signed."

Barnes went to SAPSCO's office and got its check for the total amount of premiums for all four policies. The officer who wrote the check signed a declaration of no change in his own health. The check had to be countersigned by Mr. Reinhard, the president, who was found at the hospital. He signed the check and a declaration as to his own health. There is some dispute as to when the third declaration was signed; but it was signed, and the three policies were later delivered. They are not in dispute. Ross, of course, did not sign a declaration; and he died the following day, January 21, 1962. Great American returned the premium on Ross's policy, never delivered the policy on Ross, and refused to pay the face value of the policy on Ross to SAPSCO.

The material fact question asserted in this case is whether SAPSCO knew that Great American had conditioned its offer to insure Sul Ross on his signing a declaration of no change in health. The Court of Civil Appeals said the issue of fact was whether the insurance agent Barnes accepted the check of SAPSCO conditioned upon the receipt of statement of no change in Ross's health. In order to decide whether there is a genuine issue as to this material fact we must carefully examine the evidence. For this reason, it is necessary to set out the relevant portions of the depositions presented on the motions for summary judgment.

Barnes, the agent, gave his version of what he told Reinhard, the president of SAPSCO, at the hospital:

"Q. What did you tell these people when you went to get them to sign the declaration * * *?

"* * *2

"A. * * * this is an agreement that you are in good health and that your health has not changed since the day you applied for the insurance.

"Q. Would you tell them why they had to sign that?

"A. Well, to accept the policy to say that they were in good health.

"Q. Did you tell them that it was necessary for them to make this certificate before this policy would go into effect?

"A. I might not have said that it was necessary for them to make the certificate.

"Q. Well, did you tell them, though, that this is necessary part of putting the insurance into force?

"A. Yes. Well, I would put it this way, I would say that this was needed to make the insurance valid and to bind it.

"Q. Now, you didn't tell them that the insurance was in force by

2. Further omissions of questions and answers are not indicated in the interest of brevity.

reason of their payment of the premium on Sul Ross, did you?

"A. No, sir, I sure didn't. * * * *Well, I told them that I didn't know the circumstances of how it would work out because I had never been in a situation like this before and that I would have to * * * have Mr. Ross to sign one of these forms.*

"Q. In other words, did you make it clear to Mr. Reinhard that before the policy went into force on Sul Ross he would have to sign one of these?

"A. I tried to do so. * * * *I don't remember the exact words I did tell them, but in essence I did stress that they did have to have one of these signed by Mr. Ross, we needed his signature.* Of course, I was hoping * * * he'd get well the next day or next week * * *. *I told them I didn't know exactly how the thing would work out, it would be u*,*s to the company. It was up to people far beyond me, it wasn't for me to decide.* * * * I don't believe I told them that he was or that he wasn't [insured]. * * * *I told them that I had to have a signature on that.*

"Q. Before the insurance would be in force?

"A. We didn't talk about that. *I told them that I had to have each one of those signed.*"

Ken Wingfield, the insurance company's unit manager, talked to Martin Reinhard by phone on the night of January 20. Wingfield's testimony was:

"Q. Did you express your regret that the policy on Sul Ross was not in effect?

"A. I sure did. As a matter of fact I said something that went almost like this, I said, 'Martin, I sure don't want to be the type of fellow that says I told you so or anything like that, but I sure do wish you would have seen fit to give us a check that day in the office.' Then, he said, 'Well, Mr. Ross is not dead yet.' And I said, 'No, and I hope he is not going to die, but he might become disabled and if your insurance was in force like it ought to be, we would have paid for it.' I said that paying for it doesn't mean anything because Mr. Ross has no way of signing the declaration that his health has not changed. He said, 'I know you are going to do what you can.' I said, 'I am sure, as far as we are all concerned, we want the insurance to be in force, but as far as I can see, we will have to leave that up to higher powers.'"

Mr. Reinhard could recall very little about his conversations with Barnes and Wingfield. His deposition reads:

"Q. They never told you, did they, that this policy was in force on Sul Ross' life?

"A. No, nor did they say that it wasn't.

"Q. They made no representation about when it would go into effect, did they?

"A. No. Again, only on my assumption that when we were told that he [Ross] was accepted [by passing the physical] I assumed that we were all covered.

"Q. * * * When you gave Darrell [Barnes] this check for $222.90 did you ask him if this put the insurance in force or did he make any statement in that regard?

"A. No, Darrell didn't make any statements to that effect. The fact that the company requested him to get the check, I assume that we were covered.

"Q. Did Darrell make any statement to you to the effect that he didn't know what the status of the matter was, that it would have to be up to the company to decide that he was not able to do anything more than to accept the check and didn't know what the effect would be on the insurance on Mr. Ross? Did he make such a statement to you at the hospital?

"A. Mr. King, I don't remember. That is possible.

"Q. You would certainly not deny that he made some such statement, it is entirely possible that he did?

"A. It is entirely possible."

This case is similar in many respects to Republic Nat'l Life Ins. Co. v. Hall, 149 Tex. 297, 232 S.W.2d 697 (1950). There the prospective insured sent in his application without filling in the amount of the premium because he and the insurance agent understood that he was overweight and would probably be required to pay a higher premium than normal. As expected the company rated up the policy and returned it to the agent. Before the agent delivered the policy, the applicant was killed in a plane crash. The company denied the existence of a contract. This Court held that the application was a mere invitation to the company to make an offer with a specified premium. The company made an offer, but it was not made known to the applicant and was never accepted. The law was stated to be:

" * * * as in the case of all contracts, the offer and acceptance in insurance negotiations must be such as to evidence a complete agreement, or no obligations arise. 'For acceptance by the insurer to constitute a completion of the contract, without action by the insured, such acceptance must be of the terms and conditions exactly as proposed by the application. *If the insurer accepts the application only upon certain conditions being met,* or proposes a new form of contract with new terms and provisions, that action of the insurer amounts to a rejection of the original proposition, and a counter offer which must be accepted by the insured in order to consummate the transaction.' 12 Appleman, Insurance Law and Practice, § 7151, p. 203."

In this case, the insurance company made an offer to insure Ross at a premium of $113.80 provided his health had not changed. To accept this offer SAPSCO had to pay the premium and have Ross sign the declaration of no change in health. There is no doubt that Ross could not and did not sign such a declaration.

But SAPSCO contends that this was not the offer communicated to it because it did not know the offer to insure Ross was conditioned on his signing the declaration. The Court of Civil Appeals agreed with this contention when it said that Great American's instruction to have each insured sign such a statement was in the nature of a secret instruction to its agents; and, therefore, SAPSCO would not be bound by them unless they were made known to its officers. Inherent in this conclusion is the proposition that Barnes, as agent for Great American, was clothed with apparent authority to bind the company by merely accepting the premium for the policy in question. We assume, without deciding, that this proposition is correct. The question (and a material fact) is whether the instruction from Great American to Barnes was communicated to SAPSCO.

■ This is a summary judgment case; and in answering the above ques-

tion, we must follow certain rules laid down by this Court. Rule 166–A, Texas Rules of Civil Procedure, provides that summary judgment shall be rendered if it is shown that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The burden of proof is on the movant, and all doubts as to the existence of a genuine issue as to a material fact are resolved against him. Tigner v. First Nat'l Bank, 153 Tex. 69, 264 S.W.2d 85 (1954); Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929 (1952). In other words, the evidence must be viewed in the light most favorable to the party opposing the motion. Valley Stockyards Co. v. Kinsel, 369 S.W.2d 19 (Tex.Sup.1963); Smith v. Bolin, 153 Tex. 486, 271 S.W.2d 93 (1954). If the motion involves the credibility of affiants or deponents, or the weight of the showings or a mere ground of inference, the motion should not be granted. All conflicts in the evidence are disregarded, and the evidence which tends to support the position of the party opposing the motion is accepted as true. Cowden v. Bell, 157 Tex. 44, 300 S.W.2d 286 (1957); Smith v Bolin, supra; Gulbenkian v. Penn, supra. Evidence which favors the movant's position is not considered unless it is uncontradicted. If such uncontradicted evidence is from an interested witness, it cannot be considered as doing more than raising an issue of fact, unless it is clear, direct and positive and there are no circumstances in evidence tending to discredit or impeach such testimony. Cochran v. Woolgrowers Central Storage Co., 140 Tex. 184, 166 S. W.2d 904 (1943). This exception is especially true where the opposite party has the means and opportunity of disproving the testimony, if it is not true, and fails to do so. Valley Stockyards Co. v. Kinsel, supra; James T. Taylor & Son, Inc. v. Arlington Ind. School Dist., 160 Tex. 617, 335 S.W.2d 371 (1960); Owen Dev. Co. v. Calvert, 157 Tex. 212, 302 S.W.2d 640 at 642

(1957); McGuire v. City of Dallas, 141 Tex. 170, 170 S.W.2d 722 (1943); Simonds v. Stanolind Oil & Gas Co., 134 Tex. 332, 136 S.W.2d 207 (1940). After all the evidence has been sifted in this manner, the Court must determine whether the movant is entitled to a judgment as a matter of law.

Wingfield's telephone conversation with Reinhard on the night of January 20 cannot be considered because there is conflicting testimony as to whether it occurred before or after Reinhard signed the check. We must assume it was afterwards, and anything Wingfield said at that time would be immaterial.

Reinhard said, and we accept it as the truth, that they never told him the policy was or was not in force; they made no representation about when it would go into effect; and Barnes did not make any statement as to whether the check put the insurance in force. Barnes' testimony lends support to Reinhard's statement.

■ However, Reinhard's testimony does not contradict all that Barnes said, and we must consider uncontradicted evidence for the movant. Barnes said *he told Reinhard that Ross would have to sign a declaration and that he (Barnes) did not know how the thing would work out; that it would be up to the company.* Even if Barnes is an interested witness,[3] we may consider these statements because they are clear and positive and are not discredited by any circumstances in the record. Reinhard had the opportunity to contradict this testimony and failed to do so. It is also uncontradicted that Reinhard, the president of SAPSCO, and at least one other officer signed declarations of no change in health either before or at the same time the check was signed. The language in these declarations quoted on page 43, supra, compels the conclusion that its execution was a prerequisite to the completion of the insurance contract. We find nothing in the

---

3. Barnes was a third party defendant. At the time of the deposition he no longer worked for Great American. His wife is related to Reinhard's wife.

record which would warrant an assumption by SAPSCO that Ross was to be treated any differently from the other three men.

 We hold that there is no genuine issue as to whether SAPSCO knew Great American's offer to insure Sul Ross was conditioned on his signing a declaration of no change in health and that the home office would have to consider any waiver of that requirement. Great American is therefore entitled as a matter of law to a summary judgment. The judgments of the courts below are reversed, and judgment is here rendered that plaintiff take nothing.