**Patricia WHITE, Appellant
and Appellee,**

v.

**Mark TACKETT, in his Official Capacity as State Trooper for the Texas Department of Public Safety, Appellee and Appellant.**

No. 2–04–023–CV.

Court of Appeals of Texas,
Fort Worth.

Aug. 25, 2005.

Wood, Thacker & Weatherly, P.C., Grace A. Weatherly and R. William Wood, Denton, for Appellant.

Greg Abbott, Attorney General of Texas, Barry R. McBee, First Asst. Atty. Gen., Edward D. Burbach, Deputy Attorney General for Litigation, Nelly R. Herrera, Chief, Tort Litigation and David Grant Halpern, Asst. Atty. Gen., Austin, for Appellee.

PANEL A: CAYCE, C.J.; HOLMAN and WALKER, JJ.

## OPINION

JOHN CAYCE, Chief Justice.

In this personal injury case, Patricia White was injured when a suspect fleeing from police crashed his car into hers. White sued Mark Tackett, in his official capacity as a state trooper for the Texas Department of Public Safety, for recklessness in initiating and continuing the pursuit that led to White's injuries. Tackett moved for summary judgment on his affirmative defense of official immunity. The trial court granted Tackett's summary judgment motion, and this appeal followed.[1]

In two issues, White asserts that summary judgment for Tackett is improper because Tackett's summary judgment evidence does not establish his official immunity defense as a matter of law and because White demonstrated the existence of a material fact issue regarding whether Tackett acted in good faith. In a single point on cross-appeal, Tackett complains that the trial court improperly sustained White's objections to some of his summary judgment evidence. We affirm.

In a traditional summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.[2] The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant.[3] Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant.[4]

In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence are disregarded and the evidence favorable to the nonmovant is accepted as true.[5] Evidence that favors the movant's position will not

---

1. White also sued Greg Taylor and Wesley Wood, in their official capacities as deputy sheriffs of Cooke County, Texas, and the trial court granted them summary judgment as well. White's appeal from the summary judgment in favor of Taylor and Wood was, however, dismissed by agreement of the parties.

2. Tex.R. Civ. P. 166a(c); *S.W. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002); *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979).

3. *S.W. Elec. Power Co.,* 73 S.W.3d at 215; *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997); *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex.1965).

4. *Great Am.,* 391 S.W.2d at 47.

5. *Harwell v. State Farm Mut. Auto. Ins. Co.,* 896 S.W.2d 170, 173 (Tex.1995).

be considered unless it is uncontroverted.[6] If the uncontroverted evidence is from an interested witness, it does nothing more than raise a fact issue unless it is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.[7]

■ A defendant is entitled to summary judgment on an affirmative defense such as official immunity if the defendant conclusively proves all the elements of the affirmative defense.[8] To accomplish this, the defendant-movant must present summary judgment evidence that establishes each element of the affirmative defense as a matter of law.[9]

■ Governmental employees are entitled to official immunity from suit arising from the performance of discretionary duties within the scope of their authority as long as they act in good faith.[10] A law enforcement officer acts in good faith in a pursuit case if, based on the officer's perception of the facts at the time of the event, a reasonably prudent officer in the same or similar circumstances could have believed that the need to apprehend the suspect immediately outweighed a clear risk of harm to the public in continuing, rather than terminating, the pursuit.[11] This good faith test is analogous to the abuse of discretion standard we utilize when reviewing certain trial court rulings.[12]

The "could have believed" aspect of the good faith test means that in order to be entitled to summary judgment, an officer must prove that a reasonably prudent officer *might* have believed that the pursuit should have been continued. . . . It does not mean that an officer has to prove that it would have been unreasonable to stop the pursuit; nor must the officer prove that all reasonably prudent officers would have continued the pursuit.[13]

An officer acts in bad faith only if the officer could not have reasonably reached the decision in question.[14]

■ The "need" aspect of the good faith test refers to the urgency of the circumstances requiring police intervention, including factors such as the seriousness of the crime to which the officer is responding, whether the officer's immediate presence is necessary to apprehend a suspect or to prevent injury or loss of life, and what alternative courses of action, if any, are available to achieve a comparable result.[15] The "risk" aspect of good faith, on the other hand, refers to the countervailing public safety concerns: the nature

---

6. *Great Am.*, 391 S.W.2d at 47.

7. Tex.R. Civ. P. 166a(c); *Trico Techs. Corp. v. Montiel,* 949 S.W.2d 308, 310 (Tex.1997).

8. *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999); *City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex.1994).

9. *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996).

10. *Chambers,* 883 S.W.2d at 653.

11. *Wadewitz v. Montgomery,* 951 S.W.2d 464, 466–67 (Tex.1997); *Chambers,* 883 S.W.2d at 656.

12. *Univ. of Houston v. Clark,* 38 S.W.3d 578, 581 (Tex.2000); *Chambers,* 883 S.W.2d at 657 n.7.

13. *Chambers,* 883 S.W.2d at 656–57 (emphasis supplied); *accord Clark,* 38 S.W.3d at 581.

14. *Clark,* 38 S.W.3d at 581; *Hayes v. Patrick,* 71 S.W.3d 516, 521 (Tex.App.-Fort Worth 2002, no pet.).

15. *Wadewitz,* 951 S.W.2d at 467.

and severity of harm that the officer's actions could cause (including the risk that both the fleeing suspect and the officer could injure bystanders), the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer.[16]

■ A pursuit case requires a continuing assessment of need and risk; however, the officer is not required to affirmatively negate the existence of all circumstances or risks that did not actually exist.[17] Further, the balancing of need versus risk does not prevent an officer from pursuing suspects for traffic violations or in residential or other populated or high traffic areas.[18]

■ If an officer satisfies his burden of establishing good faith, the plaintiff must put on controverting evidence to avoid summary judgment. "To controvert the officer's summary judgment proof on good faith, the plaintiff must do more than show that a reasonably prudent officer could have decided to stop the pursuit; the plaintiff must show that 'no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts.'"[19]

■ The summary judgment evidence consists of: 1) the unstricken portion of Tackett's affidavit, which was attached to Tackett's motion[20] and 2) a nine-page excerpt from Tackett's deposition testimony attached to White's summary judgment re-

sponse, which Tackett referenced, in part, in his reply to White's response.[21] This evidence shows the following:

At 5:41 p.m. on New Year's Eve 2001, Tackett was on routine patrol duty for the Texas Department of Public Safety when he clocked a new luxury sports car traveling in excess of the 55–mile–per–hour posted speed limit. The car was headed west on a rural farm-to-market road, FM 902, approximately five miles from the City of Gainesville, in what Tackett knew to be a high-crime area for theft and drug-related offenses. Tackett could not identify the make or model of the vehicle and was unable to read its license plate, but he saw two men inside who did not seem to "fit the vehicle." Tackett observed that the driver was a Hispanic male in his 20s or early 30s who was wearing what appeared to Tackett to be "work" clothes—a red sweatshirt with no logo on it. The passenger was a white male with long hair and a dirty appearance. Normally, the type of person Tackett saw in that area in a brand new luxury sports car was an older person whose dress was a "little more fitting."

Because of the vehicle's speed, both occupants' appearance, and the fact that it was a high-crime area, Tackett attempted to make a traffic stop by turning around to follow the car and activating his patrol lights. When the driver did not stop, but sped up instead, Tackett turned on his siren. The driver, who was later identified as Guadalupe Max Limones, Jr., still did not stop or slow the car. Instead, he again

---

**16.** *See Clark,* 38 S.W.3d at 583; *Wadewitz,* 951 S.W.2d at 467.

**17.** *Clark,* 38 S.W.3d at 582–83, 586.

**18.** *Id.* at 583.

**19.** *Chambers,* 883 S.W.2d at 657.

**20.** The trial court sustained White's objections to various portions of Tackett's affidavit filed in support of his summary judgment motion.

We do not consider the excluded affidavit testimony in our analysis of whether Tackett met his burden of proving that he acted in good faith.

**21.** Because the dissent has attached one page of the deposition excerpt to the dissenting opinion, we have included all nine pages of the excerpt as an addendum to this opinion in the interest of completeness.

increased his speed and began a series of maneuvers that were illegal and dangerous to himself, his passenger, and others on the road, including driving on the wrong side of the two-lane road, passing in a no-passing zone, and driving erratically and recklessly.

Although the weather was good, visibility was clear, the pavement was dry, and traffic was lighter than usual, Tackett was unable to keep up with Limones along FM 902. Unlike Limones, Tackett did not pass in no-passing zones, and he slowed down for westbound vehicles in front of him, waiting until they pulled over before he passed. Because Tackett did not then know Limones's identity, the make or model of the car, or the car's license plate number, he had no information with which to trace either Limones or the vehicle. Consequently, he radioed for assistance from other law enforcement officers.

Two Cooke County sheriff's deputies, Wesley Wood and Greg Taylor, responded to the request. They formed a partial roadblock by positioning their patrol cars, with lights flashing, at the intersection of FM 902 and FM 372—a T-intersection located approximately a mile from the Gainesville city limits and several miles west of the original encounter between Tackett and Limones.

When he reached the T-intersection, Limones did not stop. Instead, he sped past Wood's and Taylor's vehicles and proceeded north along FM 372 towards Gainesville. Wood took over the pursuit with Taylor and Tackett, respectively, at various distances behind him. Tackett lost sight of Limones's car as it proceeded towards Gainesville. Therefore, shortly after he turned onto FM 372, Tackett made another radio call requesting assistance from the Gainesville Police Depart-

ment so that Limones could be stopped on FM 372 before he reached the intersection of California and Grand Avenues, one of Gainesville's busiest intersections. Traffic was still fairly light and he was keeping watch for pedestrians and other vehicles.

Limones's car collided with a vehicle being driven by White on Broadway Street.[22] The crash occurred approximately two minutes after Limones entered Gainesville. Due to his patrol car's distance behind Limones and the other pursuing patrol units, Tackett did not witness the collision but arrived at the scene about thirty seconds after it had occurred. He saw White lying on the ground and not moving, and he called for an ambulance. He then began to pursue Limones and the passenger who, according to an eye-witness, had fled on foot.

This evidence establishes Tackett's good faith as a matter of law. It shows that Tackett assessed the initial need for the pursuit by considering Limones's speed, his dangerous, unlawful attempts to evade detention for a traffic stop, both men's appearances when contrasted with the luxury car they were in, and the fact that they were speeding in an area known for theft and drug-related offenses. Tackett also considered the lack of alternative courses of action; he could not identify either the car or its driver, so apprehending the suspect later was not an option.

The evidence further shows that Tackett assessed the risks of the pursuit. He noted that he was on a rural road, the weather was good and visibility was clear, the pavement was dry, and traffic was lighter than usual. He activated both his lights and his siren, thereby making himself more visible to other drivers. In addition, in attempting to catch Limones, Tackett

---

**22.** White contends that at the time of the collision Limones was traveling at speeds of up to 60 or 65 miles per hour in a residential neighborhood.

observed no-passing zones and slowed to allow vehicles in front on him to pull over before passing them. When he realized that he could not keep up with Limones, Tackett radioed for assistance.

The evidence further shows that Tackett continued to assess both the need for and the risks of the pursuit as it approached Gainesville. Tackett observed that Limones, who was still unidentified, did not stop for Wood's and Taylor's partial roadblock at the T-intersection of FM 902 and FM 372, thereby adding to the seriousness of his actions. Once Wood took over the pursuit and the chase proceeded towards Gainesville, Tackett did not attempt to keep up with Limones or even keep sight of the car. Instead, although traffic was still fairly light, Tackett radioed for assistance from Gainesville's police department so that they could stop Limones before he reached one of Gainesville's busiest intersections and created "a mess." Meanwhile, Tackett kept watch for pedestrians and other vehicles.

We hold that the evidence regarding Tackett's ongoing balancing of both the need for and the risks associated with the pursuit conclusively establishes that a reasonably prudent officer in Tackett's circumstances could have believed that the need to apprehend the suspect immediately outweighed a clear risk of harm to the public in continuing, rather than terminating, the pursuit.[23] Therefore, the burden shifted to White to put on controverting evidence showing that "no reasonable person in [Tackett's] position could have thought the facts were such that they justified" his actions.[24]

White has not met this burden. She contends that the Gainesville Police Department's policy and Inter–Jurisdictional Pursuit Agreement, which limit the total number of vehicles participating in a pursuit to three, are evidence that a reasonable police officer would not have believed that the pursuit should have been continued. There is, however, no evidence that the policies in effect on New Year's Eve 2001 contained the limitation on which White relies. Although Gainesville's policies in the summary judgment record became effective in May 2001, they were revised after the accident—in August 2002, May 2003, and June 2003. Therefore, it is impossible for us to determine what the policies consisted of on December 31, 2001.[25] Further, there is no evidence that White, who was a State Trooper and not a member of the Gainesville Police Department, had notice of the policies' contents.

White also asserts that Tackett's "written statement" and his deposition testimony suggest that Limones's race "may have" factored into Tackett's decision to engage in the pursuit. She contends that, if Tackett was motivated by racism, he could not have acted in good faith. Tackett testified at his deposition, however, that he decided to make the initial traffic stop based on three factors: the vehicle's speed, the appearance of *both* of the vehicle's occupants, and the fact that the car was speeding in an area known for theft and drug-related offenses. Further, Tackett testified that the things about Limones's appearance that did not "fit" the luxury sports car he was driving were his relatively young age and his attire, not his race. Moreover, Tackett observed that Li-

---

**23.** *See Clark,* 38 S.W.3d at 587–88; *Wadewitz,* 951 S.W.2d at 466–67; *Chambers,* 883 S.W.2d at 656.

**24.** *Chambers,* 883 S.W.2d at 657.

**25.** Several of the policies that White proffered from other local governments likewise had effective or revision dates after the date of the New Year's Eve 2001 accident.

mones's companion, a white male, also did not "fit" the vehicle due to his long hair and dirty appearance.

In light of this evidence, the mere fact that Tackett also observed that Limones was Hispanic is insufficient to raise a fact issue concerning whether racism was the real motivation behind Tackett's decision to engage in the pursuit.[26] To the contrary, White's argument concerning racism is, on this record, nothing more than mere surmise or speculation, which is not evidence.[27]

For all the foregoing reasons, we hold that Tackett conclusively established his good faith and that White did not controvert this evidence by presenting evidence showing that no reasonable person in Tackett's position could have thought the facts were such that they justified Tackett's actions.[28] Accordingly, the trial court properly granted Tackett summary judgment on White's claims.

The dissent misunderstands our holding and confuses summary judgment burdens of proof with the rules governing what evidence may be considered in determining whether a movant has met his burden of proof. We do not hold that Tackett is entitled to summary judgment without conclusively establishing every element of his affirmative defense, nor have we shift-

ed to White the burden of proving Tackett's affirmative defense by relying on the excerpts from Tackett's deposition testimony that White attached to her response in determining that Tackett's defense is conclusively established by the summary judgment evidence. Instead, we simply recognize that, under settled principles of Texas summary judgment law, the trial court was required to consider all of the summary judgment evidence presented by the parties in ruling on the merits of Tackett's motion, including the nine-page excerpt from Tackett's deposition that White filed with her response.[29] The fact that Tackett specifically referenced only one page of the deposition excerpt in his reply to White's response does not, as the dissent contends, preclude us from considering the testimony contained in the other eight pages of the excerpt in determining whether Tackett's affirmative defense was conclusively established by the summary judgment evidence. Neither party's burden of proof is changed by our determination that this uncontested summary judgment evidence supports Tackett's motion.

We overrule White's two issues and affirm the trial court's judgment.[30]

WALKER, J., filed a dissenting opinion.

---

26. *See S.W. Elec. Power Co.*, 73 S.W.3d at 215.

27. *See Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993); *Kindred v. Con/ Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983) (both holding that circumstantial evidence may be used to establish any material fact, but it must transcend mere suspicion or surmise).

28. *See Chambers*, 883 S.W.2d at 657.

29. *See* TEX.R. CIV. P. 166a(c) (providing for trial court to rule on summary judgment motion based on, among other evidence, deposition transcripts referenced or set forth in mo-

tion or response); *Wilson v. Burford*, 904 S.W.2d 628, 629 (Tex.1995) (holding that deposition transcript referred to in plaintiffs' response to defendants' motion for summary judgment was, "by the plain language of Rule 166a(c), proper summary judgment evidence on which both the movant and the respondent could rely").

30. In light of our holding on White's issues, we need not consider Tackett's issue on cross-appeal regarding the trial court's rulings on his summary judgment evidence. *See* TEX. R.APP. P. 47.1 (providing that appellate court need address only those issues necessary to final disposition of appeal).

ADDENDUM

PLAINTIFF'S EXHIBIT D

IN THE DISTRICT COURT OF
COOKE COUNTY, TEXAS,

235TH JUDICIAL DISTRICT

PATRICIA WHITE

VS

MARK TACKETT, in his Official Capacity as State Trooper for the Texas Department of Public Safety, GREG TAYLOR, in his Official Capacity as Deputy Sheriff for Cooke County, Texas, and WESLEY WOODS, in his official Capacity as Deputy Sheriff for Cooke County, Texas.

CAUSE NO. 02–533

ORAL DEPOSITION OF
MARK TACKETT

AUGUST 12, 2003.

ORAL DEPOSITION of MARK TACKETT, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 12th day of August, 2003, from 10:37 a.m. to 1:00 p.m., before Denise A. Neu, CSR in and for the State of Texas, reported by machine shorthand, at the offices of the Sullivant Law Firm, 209 South Dixon, in the City of Gainesville, County of Cooke, State of Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

PROCEEDINGS

MARK TACKETT,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. WOOD:

Q. Would you state your full name, please, sir.

A. Mark Edward Tackett.

Q. And what is your profession, please?

A. State Trooper.

Q. Generally, the way I address people in your position, I just say Officer. Will that be all right if I just refer to you as Officer?

A. Whatever is fine.

Q. Okay. All right. Well, Officer, my name is Bill Wood, and, together with Grace Weatherly, we represent a lady by the name of Pat White in this lawsuit that you're here about today. Do you have an understanding that's who I am?

A. Yes, sir.

Q. Okay. If I ask you a question today that you don't know the answer to, rather than guessing or speculating what the answer might be, will you just agree to tell me now that you don't know the answer?

A. Yes, sir. I will.

Q. But traffic was not—not heavy at all, was it?

A. No, sir.

Q. And are these things that I'm talking about, like the condition of the roadway and the traffic and the location, are those factors that you considered in making a determination that—that it was safe for you to pursue him at high speed?

A. Yes, sir.

MR. HALPERN: Objection, form.

A. Yes, sir.

Q. (BY MR. WOOD) Now, while you're on the highway and before we get to the point where he's turned on 372, tell me

what, if any, considerations you had about whether it was safe for you to drive as fast as 115 miles an hour to chase this guy.

A. Okay. You're talking about from the time it started to 372; is that correct?

Q. Yes, sir.

A. You want me to tell you why I thought it was all right to drive like that?

Q. Yes, sir.

A. Okay. Mainly for the reasons that you just listed. I had a—I had a misdemeanor upgrade to a felony just by his driving and by his actions. There was very—very few vehicles on the road. And I had already seen that—that he had no regard for other people's safety by driving on the wrong side of the road, passing in a no-passing zone. And I believe that any reasonable person that saw my lights and knew that I was a peace officer would stop. And he didn't.

Q. All right. So during that time, did you feel like there was a—a need to apprehend that gentlemen in the Jaguar?

A. Yes, I did.

Q. All right. And now, tell me—tell me everything that you knew or thought of at that time that—that weighed on your decision in chasing him with regard to why it was important for you to immediately apprehend him.

A. The area that we were in has a high rate of criminal activity. And I'm not speaking specifically of that highway. I'm speaking specifically of the area. We have a lot of stolen items out there. There are a lot of people—narcotic-related issues. There's—there's more—there's an increased amount of criminal activity on that side of the county and that portion.

For that date and time seeing those two subjects drive a new-looking sports car or luxury car at a high rate of speed on that highway, first—that's what first alerted my attention.

What gained my suspicion is—that there could possibly be more criminal activity inside the vehicle is, number one, the driver and passenger did not fit the vehicle. I'm—

Q. They didn't fit the vehicle?

A. No, sir. They did not. In that area to see that kind of vehicle, that's just not the kind of—that's not a normal description of people. I'm not saying it's impossible. I'm just saying normally we don't see driver/passenger in that combination driving a newer model luxury vehicle.

Q. You mean like they were too heavy or too small? What do you mean they didn't fit the vehicle?

A. No, sir. What I mean is that you don't usually see a young male dressed wearing a—or a sweatshirt, with a passenger that—with the appearance that he had. You don't see those two people in a brand-new luxury car in that area.

Seeing that type of vehicle in that area is not uncommon due to the Lake Kiowa area. And normally in that area with that type of vehicle it's an older person or somebody who's dress is a little more fitting.

Q. Okay. Maybe I'm getting there. But the—I didn't understand what you were saying. But you're saying the youth and dress of these people that you saw in the Jaguar caused you to be suspicious; is that what you're saying?

A. That's half of it.

Q. What's the other half?

A. The other half is that they didn't stop. A normal person that sees lights on a police vehicle after they just got through driving at a high rate of speed past them would know that, okay. He's coming after

me. I need to go ahead and pull over. They didn't pull over. They ran.

And that, plus, being in that part of the county increased my suspicions for criminal activity.

Q. Okay. I guess when that vehicle passed you, is that when you made the observations about the way these people were dressed in the Jaguar?

A. That's when I saw the people in the Jaguar. Yes.

Q. Well, describe them for me from the standpoint of what you saw when they passed you.

A. Okay. When they came past me I saw a young—when I say young, I'm not talking about 18, 19 years old. I just mean—a younger—about my age—Hispanic male wearing what appeared to be work clothes. And a passenger—

Q. Before you leave that, let me ask you: What do you mean by work clothes? What—

A. Sweatshirt. Looked like they had come from work. Not the normal—not the normal attire you would expect somebody driving a luxury car to be wearing.

In that area every time—not every time. Excuse me. Normally when I see a luxury car in that area, it's—people are dressed a little differently. And they're not young. I'm sorry.

Q. No. I didn't mean to interrupt you. Go ahead. They're not young.

A. Normally when I see a vehicle like that in that area, it's—like I say, it's usually driven by an elderly person—and I don't mean 80, 90. I'm just talking over my age.

Q. Somebody that's old as me maybe?

A. I'm not trying to imply anything. But somebody that—an older person, who

is just normally dressed differently. And when I say that, I'm speaking of the work clothes looking attire that

Q. Okay. Well, tell me any other observations about the driver that you made other than he was somebody maybe in his 20s or early 30s, is that fair?

A. Yes, sir.

Q. All right, And he was Hispanic?

A. Yes, sir. He was.

Q. And he had on a red sweatshirt that appeared to be absent any logos. Is there anything else you noticed about the driver as you passed him?

A. No, sir.

Q. Okay. Tell me what you noticed about the passenger, if anything, as the vehicle passed you.

A. The passenger—the main thing I got when I looked at him—the main thing that stuck in my mind when I saw past the driver into the passenger was that he had a long hair and that he just appeared dirty.

Q. Okay. Anything about the clothing of the passenger that you noticed?

A. No, sir.

Q. Could you tell whether the passenger was Hispanic?

A. No, sir. He was white.

Q. And—and I think you understand—I'm talking about—and I'm wanting to know what you saw coming in with two or three people under arrest. And it just—a lot of things being stolen on that side and narcotics escalated. So that's why I went over there that particular night.

MR. WOOD: Okay. Objection, nonresponsive.

Q. (BY MR. WOOD) Is that a road where it would be normal to—on an occasion like the time of day it was on Decem-

ber 31st and the nature of the traffic and the weather, would it be unusual to stop somebody for speeding who's going 70 miles an hour on that road?

A. Who's going 70?

Q. Yes, sir.

A. If I don't answer the question, I apologize. But there are people out there that go 70. And the majority of the ones that I stop know that the speed limit is 55. They just tell me it's such a nice good road coming from the golf course and they go 70.

Q. And my question really is: Is it—you don't stop everybody that's going 70 out there, do you?

A. Well, everybody I can.

Q. Okay. Now, at what point did you turn on the video camera during this pursuit?

A. It's done automatically by the light bar.

Q. Okay. So when you turned on the light bar, the video camera came on?

A. Correct.

Q. Now, let me go back to something we spent a little time on. And that's during that period of time that you had to observe the two people in the—in the Jaguar as you were passing them, did either one of them have a hat on?

A. Not that I recall.

Q. You told me that the driver had on a—I don't want to misquote you. Was it a red sweatshirt?

A. (Witness nods.)

Q. Is that right?

A. Yes, sir.

Q. And when you say sweatshirt, are you talking about in the traditional sense like a cotton sweatshirt?

A. Yes, sir.

Q. Okay. Was it long sleeved or short sleeved?

A. I believe it was long sleeved.

Q. And you told me—well, before I get to that. Did the driver of that vehicle have any facial hair?

A. I don't recall.

SUE WALKER, Justice, dissenting.

Because the majority misapplies the traditional summary judgment burdens of proof and standards of review, I respectfully dissent.

The standards for reviewing a motion for summary judgment are well established. The movant has the burden of showing that there is no genuine material fact issue and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Calvillo v. Gonzalez*, 922 S.W.2d 928, 929 (Tex.1996); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). When a defendant moves for summary judgment based on an affirmative defense, the defendant bears the burden of proving each essential element of that defense. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex.1996). If the movant's motion and summary judgment proof facially establish the movant's right to judgment as a matter of law, then the burden shifts to the nonmovant to raise a fact issue precluding summary judgment or to show that the movant's legal position is unsound. *City of Houston*, 589 S.W.2d at 678; *St. Paul Ins. Co. v. Mefford*, 994 S.W.2d 715, 718 (Tex.App.-Dallas 1999, pet. denied) (op. on reh'g).

In her first issue, White contends that Tackett failed to meet the first summary judgment prong; that is, he failed to prove every element—specifically the good faith element—of his affirmative defense of official immunity to establish his right to

judgment as a matter of law. The summary judgment evidence produced by Tackett consists only of his own affidavit and a copy of a settlement agreement. The settlement agreement is not relevant to Tackett's affirmative defense. White objected to various portions of Tackett's affidavit, and the trial court entered a five-page order sustaining all of White's objections. A total of approximately five pages of Tackett's nine-page affidavit were ordered stricken. The remaining portions of Tackett's affidavit fail, as a matter of law, to establish the good faith element of Tackett's alleged official immunity defense. *See City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994) (recognizing good faith is element of official immunity defense that governmental employee must prove).[1] Consequently, the burden never shifted to White to come forward with any controverting summary judgment evidence. *See, e.g., Casso v. Brand*, 776 S.W.2d 551, 556 (Tex.1989); *City of Houston*, 589 S.W.2d at 678. Because Tackett's summary judgment evidence—the unstricken portions of his affidavit—failed to conclusively establish the essential good faith element of his affirmative official immunity defense, the trial court erred by granting summary judgment for Tackett on his affirmative defense.

The majority does not dispute that Tackett's summary judgment evidence alone (the unstricken portions of his affidavit) is insufficient to conclusively establish the good faith element of his affirmative defense. The majority instead holds that controverting summary judgment evidence attached to White's response—specifically excerpts from Tackett's deposition—satisfied Tackett's initial burden of conclusively establishing every element of his affirmative defense. The majority attempts to justify its reliance on White's controverting summary judgment evidence by indicating that Tackett's reply cites White's evidence, specifically Tackett's deposition testimony. Tackett's reply, however, contains a citation to only *one page*—page 45—of his deposition and that evidence was not on file twenty-one days before the hearing. *See* Tex.R. Civ. P. 166a(d). The majority's analysis nonetheless utilizes *all* of Tackett's deposition excerpts attached as controverting summary judgment evidence to White's response, not just page 45 referenced by Tackett in his reply.[2]

The Texas Supreme Court has explained that while the majority's approach may be appropriate in federal summary judgment practice, it is not in Texas traditional summary judgment practice:

> Under [Fed.R.Civ.P.] 56c, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Casso*, 776 S.W.2d at 556 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). The supreme court has explained that traditional Texas summary judgment practice, unlike federal summary judgment practice, involves a distinct, two-step process:[3]

---

1. *See also* Exhibit A attached hereto, a copy of Tackett's affidavit with the portions ordered stricken omitted.

2. Page 45 of Tackett's deposition, mistakenly referred to in his reply as page 42, is attached hereto as Exhibit B.

3. First, the movant bears the burden of coming forward with summary judgment evidence proving each essential element of his cause of action or affirmative defense. *See, e.g., Ryland Group, Inc.*, 924 S.W.2d at 121. If the movant's motion and summary judgment proof facially establish the movant's right to

Texas law, of course, is different. While the language of our rule is similar [to the federal rule], our interpretation of that language is not. We use summary judgments merely "to eliminate patently unmeritorious claims and untenable defenses," and *we never shift the burden of proof to the non-movant unless and until the movant has "establish[ed] his entitled to a summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of his cause of action or defense as a matter of law."* *Casso*, 776 S.W.2d at 556 (citing *City of Houston*, 589 S.W.2d 671, 678 n. 5) (emphasis added).

Nor can I agree with the majority that Rule 166a(c) or the holding *Wilson v. Burford* authorize the trial court to grant summary judgment to a defendant moving for a traditional summary judgment on the basis of an affirmative defense when the defendant movant's summary judgment evidence fails to conclusively establish every element of the defense. TEX.R. CIV. P. 166a(c); *Wilson v. Burford*, 904 S.W.2d 628, 629 (Tex.1995). The Texas Supreme Court in *Casso* rejected this interpretation of Rule 166a(c)'s language, making it clear that the burden of proof never shifts to the nonmovant unless the movant conclusively establishes all essential elements of his cause of action or affirmative defense—which Tackett undisputedly did not do, even considering page 45 of his deposition. *Casso*, 776 S.W.2d at 556. And in *Wilson*, the supreme court explained that when a *movant* attaches a deposition transcript to a brief filed in support of the *movant's*

motion for summary judgment, the trial court may consider the deposition transcript as part of the *movant's* summary judgment evidence. *Wilson*, 904 S.W.2d at 628–29. The *Wilson* court did not alter the fundamental principle that a movant must conclusively establish all essential elements of his cause of action or defense as a matter of law before the burden shifts and the trial court looks to the nonmovant's summary judgment evidence. *See, e.g., Ryland Group, Inc.*, 924 S.W.2d at 121; *Steger v. Muenster Drilling Co.*, 134 S.W.3d 359, 378 n. 18 (Tex.App.-Fort Worth 2003, pet. denied) (recognizing "defendant-movant *must present summary judgment evidence* that establishes each element of the affirmative defense as a matter of law") (emphasis added).

Although the majority claims not to shift the traditional summary judgment burdens of proof, it does. The majority upholds an affirmative defense summary judgment even though the movant's summary judgment evidence (even, in fact, including page 45 of Tackett's deposition referenced in his reply) is not sufficient to conclusively establish every essential element of the affirmative defense. The majority instead looks to controverting summary judgment evidence produced by the nonmovant White to determine whether the movant Tackett met his initial burden of proof of conclusively establishing every element of his affirmative defense.

Because I cannot agree with the majority's departure from established summary judgment law, I dissent. I would sustain White's first issue,[4] reverse the trial

judgment as a matter of law, then the second step is triggered and the burden shifts to the nonmovant to come forward with summary judgment evidence raising a fact issue. *City of Houston*, 589 S.W.2d at 678.

4. In her second issue, which I would not reach, White challenges the second summary judgment prong; she claims that if, somehow, Tackett conclusively established every element of his affirmative defense of official immunity, then she met her summary judgment burden of coming forward with controverting

court's summary judgment for Tackett, and remand the case to the trial court.

ExHIBIT A

**AFFIDAVIT OF MARK TACKETT**

STATE OF TEXAS

COUNTY OF COOKE

BEFORE ME, the undersigned authority, on this day personally appeared MARK TACKETT, who I personally know or who presented positive identification of his identity to me, and who being by me first duly sworn did state under oath the following:

"My name is Mark Tackett, I am over the age of eighteen, have never been convicted of a crime, am fully competent to make this affidavit, and have personal knowledge of the facts stated herein which are true and correct.

I have been commissioned peace officer for nearly six years and I am employed as a trooper for the Texas Department of Public Safety (DPS). I am a certified peace officer, licensed by the State of Texas, and sworn to uphold and enforce the laws of the State of Texas. I have been trained in traffic enforcement, the operation of radar equipment, the making of traffic stops and the safe operation of a DPS patrol car. I began Basic Training School for the Uniformed Service at the Law Enforcement Academy in September 1997. I successfully completed my basic training in March 1998 and became a commissioned DPS Trooper at that time. I am familiar with state traffic law and Department policies relating to traffic enforcement, traffic stops and the pursuit of criminal violators. My duties include patrolling Texas public roads and highways.

My duties include exercising discretion in deciding when to make a traffic stop, where to make a traffic stop, and how to make the traffic stop. My duties also include exercising discretion in deciding when to undertake a pursuit, where to undertake a pursuit, and how to carry out the pursuit.

On December 31, 2001, I was assigned routine patrol, working a shift from 5 p.m. to 2 a.m. At approximately 5:41 p.m., while in the course and scope of my employment as a DPS trooper, I was in my patrol car, patrolling Farm to Market Road 902, traveling east, when I observed a light colored car driving west on Farm to Market 902, between Lake Kiowa and Gainesville. This is approximately five miles from the city limits of Gainesville. Both vehicles were climbing toward the crest of a hill when we crossed paths. I turned on my radar and clocked the vehicle's speed to be over the posted speed limit of 55 miles-per-hour. Based upon this information, I exercised my discretion to make a traffic stop of the suspect. As the vehicle passed by me, I saw two men inside. I did not identify the make or model of vehicle, but I recognized the vehicle as a luxury sports car that appeared to be new, a vehicle I later identified to be a Jaguar. I was unable to note the vehicle license plate number. I turned on my overhead lights, checked for approaching and oncoming traffic on FM 902 and, after determining that it was safe to do so, I made a u-turn in the direction of the westbound suspect vehicle. FM 902 is a two-lane road. I estimate that it took me approximately 5–10 seconds to complete this maneuver and begin traveling westbound.

summary judgment evidence demonstrating the existence of material fact issues concerning Tackett's official immunity defense. *See*

Tex.R.App. P. 47.1 (court of appeals must address only issues necessary to disposition of appeal).

Because I was on the down-side of a hill when I began to travel west, the suspect vehicle was no longer in view. It took several seconds for me to regain visual contact with the vehicle after I drove back up the same hill where I had encountered the suspect. It was at this point that I came to believe that the suspect vehicle had not slowed down in response to my lights and appeared to be increasing in speed. Based upon this observation, I exercised my discretion to increase my speed so that I could get closer behind the vehicle, attract the driver's attention, and make the traffic stop.

It is my experience that suspected traffic offenders do not always stop when I first engage my overhead emergency lights. They may be appearing to flee from me, but will generally stop when they see my patrol car emergency lights and hear my siren as I approach from behind. I expected the driver of the suspect vehicle to stop once I got closer to him. For these reasons, I turned on my siren as I attempted to catch up to the suspected vehicle. The lights and siren were also intended to alert other motorists on the road and warn them to pull over to the side of the road so that I could safely pursue the speeding vehicle.

. . .

The time of the day was late afternoon. Visibility was clear. Dusk was approaching, making my emergency lights more noticeable than they would be during the middle of a typical day. The weather was good. The pavement was dry. Traffic was lighter than usual. It was the start of the New Year's holiday and it is my experience that some people leave work early to prepare for New Year's Eve activities.

. . .

On this stretch of FM 902, I was unable to maintain constant visual contact with the suspect vehicle.

I radioed Sheriff's dispatch, providing a general description of the vehicle and its direction. However instead of slowing down to stop in response to my lights and siren, the vehicle continued heading west of FM 902 at what appeared to be a higher rate of speed.

. . .

It is my experience and training that alcohol consumption can impair driver's judgment, increasing the risk of an accident and injury to himself and others.

. . .

I am familiar with the subject of the photograph that is attached to this affidavit and state that this photograph fairly and accurately represents the scene, and interior view from the passenger's side of the vehicle driven by Guadalupe Max Limones, Jr., as it was found at the time on December 31, 2001.

I observed the driver make a series of dangerous maneuvers, including driving in the oncoming lane of traffic, passing in a no passing zone, and driving erratically and recklessly.

. . .

At the time, I was patrolling the east side of Cooke County, an area known by law enforcement officers, including DPS, to have a higher rate of property crimes, such as theft. It is an area in which arrests for the possession and sale of illicit drugs is—and was at the time—also higher. In my experience, it would not be unusual to see a luxury sports car in the vicinity of Lake Kiowa. It would not be unusual to encounter a luxury sports car whose driver was exceeding the speed limit. It was, however unusual and suspicious to encounter a late model luxury sports car whose driver engaged in maneuvers that were plainly dangerous to himself, his passenger, and other motorists on FM 902, in an apparent attempt to evade an otherwise routine traffic stop.

. . .

Within approximately one-and-a-half minutes of my initial move to turn on my

vehicle's emergency lights, the suspect driver has escalated the seriousness of his criminal offenses from speeding, a class C misdemeanor to reckless driving, a class A misdemeanor to evading authorities, state jail felony.

. . .

This stretch of FM 902 is open country. I saw no pedestrians and traffic was light in both directions.

. . .

During the pursuit along FM 902, I maintained radio contact with Cooke County Sherriff's Dispatch, reporting my location, direction, and the general description of the vehicle.

. . .

FM 902, westbound, ends at FM 372. This is a t-intersection. A right turn onto FM 372 heads north toward Gainesville, approximately one mile from the intersection. A left turn onto FM 372 heads south, away from Gainesville and toward Lake Ray Roberts.

From the time I turned around to drive westbound on FM 902, my pursuit of the suspect vehicle occurred over a period of some two-and-a-half minutes. Over approximately the first two minutes, I came to believe that I was unable to catch up the vehicle. I estimated the vehicle's speed to range between 100–and–150 miles-per-hour. I estimate my vehicle's top speed to have been 115 miles-per-hour. I also realized that I was losing ground due to the reckless manner in which the suspect was driving. While he passed other vehicles without regard to the safety of others, I observed the no passing zones. I also slowed down for other westbound vehicles in front of me, waiting until they pulled over before proceeding to pass by them.

. . .

I had not determined the identity of the driver or passenger, the make or model of the vehicle, or the vehicle's license plate number. Therefore, I had no information with which to trace the suspect or vehicle.

. . .

My initial radio call to the Sheriff's Department, requesting assistance, was acknowledged immediately and I understood that help was on the way. As the suspect approached the intersection of FM 902 and FM 372, I saw two patrol vehicles sitting in the intersection with emergency lights flashing, waiting for the suspect to arrive. I, then, witnessed the suspect drive past the patrol cars, making a right turn on FM 372 in the direction of Gainesville.

. . .

After the suspect passed the Cooke County patrol cars at the intersection of FM 902 and FM 372, Deputy Wood took over the pursuit in his vehicle. The other patrol car, operated by Deputy Taylor, became the second behind the suspect. When I reached the intersection of FM 902 and FM 372, I was the third patrol vehicle behind the suspect.

I have read the deposition of Deputy Taylor and now understand that I became the fourth patrol car behind the suspect. According to Deputy Taylor's testimony, he waited to allow another Sheriff's patrol car to back out of a driveway near the intersection of Howeth and Moss. The patrol car became the second patrol car behind Deputy Wood. The intersection of Howeth and Moss is approximately twelves blocks from the intersection of Broadway and Ritchey, where the collision occurred.

. . .

Shortly after I turned onto FM 372, I made another radio call to request additional assistance from the Gainesville Police Department.

. . .

This is an intersection controlled by a traffic light and is one of Gainesville's busier intersections.

. . .

As the suspect proceeded toward Gainesville, I was too far back to maintain sight of his vehicle, I continued to follow the patrol vehicle of Deputy Taylor. Based upon Deputy Taylor's route of travel and radio reports from Deputy Wood, the suspect took several side streets before reaching the intersection of California and Wine Streets. The suspect apparently proceeded west on California for a short distance before turning north on Ritchey Street. Due to my distance behind the suspect and pursuing patrol units, I did not witness the collision between the suspect vehicle and the vehicle driven by Patricia Ann White. The collision occurred at the intersection of Ritchey and Broadway approximately two minutes after the suspect entered the city limits.

Throughout the drive of FM 372 toward Gainesville, . . . as well as within the city limits of Gainesville, I kept watch for pedestrians and other vehicles. Traffic was still fairly light. There was still sufficient daylight

I arrived at the scene of the accident approximately 30 seconds after the collision was reported. Ms. White was lying on the ground. She was not moving. I immediately requested that an ambulance be called. Paramedics arrived on a fire truck a short time later. I, then, turned my attention to locating the suspects who, according to eye witnesses, fled on foot, as did the passenger of the vehicle.

. . .

I did not know of these facts or allegations at the time of my attempted traffic stop of Guadalupe Max Limones on New Year's Eve.

. . .

Further affiant sayeth not."

/s/ Mark Tackett

MARK TACKETT

SWORN TO AND SUBSCRIBED before me, by said MARK TACKETT on this the 4 day of Sept. 2003, to certify which witness my hand and seal of office.

/s/ Vickie Camp

NOTARY PUBLIC

/s/ Vickie Camp

(Printed name of Notary)

My commission expires: 12-21-03

### Exhibit B

was very—very few vehicles on the road. And I had already seen that—that he had no regard for other people's safety by driving on the wrong side of the road, passing in a no-passing zone. And I believe that any reasonable person that saw my lights and knew that I was a peace officer would stop. And he didn't.

Q. All right. So during that time, did you feel like there was a—a need to apprehend that gentlemen in the Jaguar?

A. Yes, I did.

Q. All right. And now, tell me—tell me everything that you knew or thought of at that time that—that weighed on your decision in chasing him with regard to why it was important for you to immediately apprehend him.

A. The area that we were in has a high rate of criminal activity. And I'm not speaking specifically of that highway. I'm speaking specifically of the area. We have a lot of stolen items out there. There are a lot of people—narcotic-related issues. There's—there's more—there's an increased amount of criminal activity on that side of the county and that portion.

For that date and time seeing those two