**Joe F. MABERRY, Appellant,**

v.

**John E. JULIAN et al., Appellees.**

**No. 7978.**

Court of Civil Appeals of Texas, Texarkana.

June 2, 1970.

Rehearing Denied June 23, 1970.

Ronald A. Dubner, Christopher M. Weil, Dallas, for appellant.

John Fox Holt, Dallas, for appellees.

CHADICK, Chief Justice.

Grounding his demand upon a written contract, or alternately quantum meruit, Joe F. Maberry sued John E. Julian and Julian Enterprises, Inc. jointly and severally to recover a real estate broker's commission. On motion of John E. Julian and Julian Enterprises, Inc., summary judgment was entered in the district court that Maberry

take nothing by his suit. The judgment of the trial court is reversed and the case remanded.

The written contract in suit was between John E. Julian and Southwest Industrial Properties, Inc.; Joe F. Maberry, a licensed real estate broker, prepared the instrument. In writing the contract Maberry made use of the Dallas Real Estate Board's printed Contract of Sale form. The initial unnumbered paragraph of the front or first page of the contract named parties, described property, recited the sale and purchase obligation, and stated the agreement was made upon the terms and conditions that followed. The terms and conditions thereafter set out were separated into numbered paragraphs. Paragraph 1 states the purchase price, etc. Paragraph 2 deals with possession and delivery, and provides for consummation of the transaction by closure on September 1, 1965, or sooner at the option of the seller. Paragraph No. 3 has printed the words "Special Conditions:" followed by a blank space in which several particulars of the agreement were typed. Having a controlling influence in this appeal is the following condition typed into paragraph 3, to-wit:

"This contract is subject to Purchaser's obtaining a change in the zoning on the tract herein being purchased, which zoning change is to be satisfactory to purchaser or at purchaser's option this contract can be terminated and the escrow deposit of $25,000.00 returned to the purchaser. The closing of this contract is to take place thirty (30) days after the zoning on the above tract is final in every respect."

Enlarged type across the page, near its bottom, prominently stated: "Paragraphs 4 through 16 on the reverse side constitute a part of this agreement." The statement is followed by the date February 10, 1965, and the signatures of the parties. To the left of Julian's signature under the word Agent "Joe Maberry and Company" is typed onto a line above the words Principal Agents, Member of the Dallas Real Estate Board.

The reverse side of the first page contains printed paragraphs 4 through 16. Paragraph 4 was slightly altered by interlineation of no pertinence in this appeal. Paragraph 5 was marked through, and apparently stricken from the agreement. In paragraph 13 the words *computed on the total purchase price of the property in accordance with the schedule recommended by the Dallas Real Estate Board as of the date of this Contract* were marked through, and in their place was hand lettered emed of *$18,000.00*. Paragraph 13, as amended, reads as follows, to-wit:

"Seller agrees to pay to the Real Estate Agent first named below (referred to herein as the 'Principal Agent') a commission for negotiating this contract of $18,000.00. The Principal Agent's right to such commission shall irrevocably vest upon the execution of this contract, notwithstanding any subsequent termination or variation of this contract or any default by Seller or Purchaser except that no commission shall be payable in the event that this contract should be terminated by Purchaser by reason of destruction or damage beyond repair of the buildings and improvements located on the property, and except that if this contract is not consummated by reason of Purchaser's default and Seller does not elect to enforce specific performance, the commission shall not exceed one-half of the aforesaid cash deposit. Said commission shall be paid by Seller to the Principal Agent in Dallas, Texas, at the Closing (or in the event of default by Seller or Purchaser, then said commission shall be paid within ten days after the scheduled closing date). The Principal Agent shall be entitled to apply any escrow deposit, to the extent necessary, toward payment of the commission payable to him hereunder, and any title company or other escrow agent is hereby authorized and directed to pay to the Principal Agent out of any escrow de-

posit made pursuant to this contract a sum equal to the commission payable to the Principal Agent hereunder. The Principal Agent may divide any commission payable hereunder with other licensed real estate brokers or salesmen, including any cooperating agent named below but, notwithstanding any such agreement for division of commissions, Seller shall be fully protected in paying all commissions payable hereunder solely to the Principal Agent."

Unless buildings and improvements were damaged beyond repair the terms of the printed form did not supply a means for termination of the contract short of consummation or breach. On this vital subject, termination, an addition to the contract was made by the previously quoted special provision typed into paragraph 3. This provision afforded Southwest Industrial Properties, Inc., as purchaser, an option to terminate the contract if satisfactory zoning changes could not be effected. Following negotiations the parties to the instrument, and Maberry the scrivener, wrote into the contract this segment of the agreement as a special condition, designating it as such, thereby differentiating it from the general terms and conditions of the contract. By agreeing that the contract would be subject to the purchaser obtaining a satisfactory change in zoning, the parties clearly intended that such change in zoning should precede consummation of a sale unless waived by the purchaser. In effect, change to satisfactory zoning, unless waived by Southwest Industrial Properties Inc., was made a condition precedent to performance of the other terms of the contract.[a]

At this point it is timely to notice that if Southwest Industrial Properties, Inc., merely breached the special condition by failure to timely close the sale, Maberry's rights would be governed by paragraph 13 quoted above. Without detailed explanation it may be stated that the record is such that no basis exists for a summary judgment if paragraph 13 of the contract binds the parties. Under the construction here adopted only the purchaser, Southwest Industrial Properties, Inc., had an option and was privileged by the contract's terms to forego consummation and terminate the agreement without' liability. The inquiry then turns to whether or not the facts, circumstances and inferences properly to be drawn show as a matter of law that Southwest Industrial Properties Inc., exercised the option to terminate the contract.[b] This will be considered as a more extensive statement of the facts is made in the course of further discussion.

From a deposition on file it appears that the 85 acres described in the contract was zoned for residential use at the date of the contract, and that under the ordinances of the City of Carrollton final action on a zoning, or rezoning, request or application precluded a zoning change for a period of one year. It seems to follow that no zoning regulation of the City of Carrollton was final in a strict sense for a period longer than one year. The special condition by its plain wording referred to the zoning ordinances as they existed and were applicable at the time. So construed, the special condition contemplated an effort to rezone after the contract was signed and fixed an ascertainable date for the sale to be closed unless previously terminated. In harmony with this immediate conclusion and the construction explained in the preceding paragraph, Southwest Industrial Properties Inc., had 30 days after the zoning change was denied on July 19, 1965, in which to close the deal delineated by the contract, if it did not opt to terminate.

---

a. 13 Tex.Jur.2d Contracts, Sec. 151; 17–A C.J.S. Contracts § 338.

b. As movant for summary judgment, Julian had such burden. Gibbs v. General Motors Corporation, 450 S.W.2d 827 (Tex. 1970); Freeberg v. Securities Investment Co. of St. Louis, 331 S.W.2d 825 (Tex.Civ.App. San Antonio, 1960, writ ref.). See also Great American Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41 (Tex.1965).

On June 24, 1965, Maberry caused an application to be filed with the City of Carrollton, Texas, to rezone the contractual 85 acres from residential to local retail and industrial use. The Carrollton Planning Commission denied the application on July 13, 1965, and an appeal from the decision was lodged with the Carrollton City Council. This appeal, on July 19, 1965, was withdrawn and the Planning Commission's denial became final. John E. Julian's deposition shows that he later applied to change zoning to industrial use, and his application was denied by the City Council. The exact date of these events are not shown, but it was after July 19, 1965, and before October 3, 1967. On July 21, 1965, Joe F. Maberry wrote John E. Julian this letter:

"It is my understanding that the Contract of Sale between you and Southwest Industrial Properties Inc. for the purchase from you of approximately 85 acres located at Josey Lane and Belt Line Road, Carrollton, Texas, dated February 10, 1965, which we negotiated as Agent has been terminated in accordance with the Special Condition covering change in zoning. If such is the case, this is to advise you that you owe us no commission.

"I'm sorry the zoning change took the turn it did, and I am hopeful that at some future date you will be successful in rezoning this property. I'll help you in any way I can."

Maberry wrote the following letter dated July 29, 1965, to a representative of Southwest Industrial Properties, Inc.:

"Transmitted herewith is Southwest Industrial Properties Inc's check in the amount of $25,000.00 representing earnest money deposit on their contract to purchase Mr. Julian's property in Carrollton. I'm sorry this didn't work out.

"Let's try another deal soon."

The record is silent on acknowledgment or receipt of this letter and check by Southwest Industrial Properties, Inc.

Following denial of the zoning change July 19, 1965, employees and agents of Southwest Industrial Properties Inc., intermittently approached Julian and negotiated with him for the purchase of the 85 acre tract. On October 3, 1967, Julian entered into a contract to sell the land to Southwest Industrial Properties, Inc. This contract was consummated. Pending completion of this transaction, for personal reasons, Julian and his three children deeded the property to Julian Enterprises Inc., and that entity conveyed the land to Southwest Industrial Properties Inc., by general warranty deed dated February 22, 1968.

Although repetitious it is again stressed that the crucial and determinative question in this appeal is: Does the record show as a matter of law that Southwest Industrial Properties Inc., exercised its option to terminate the contract with Julian dated February 10, 1965? There is no direct testimony upon this question from either Julian, Maberry, or a corporate representative of Southwest Industrial Properties, Inc. The evidence of the conduct of the broker and the contract's signatories will be looked to for such inferences and deductions as it yields or justifies. Maberry's two letters heretofore reproduced, the one to Julian dated July 21, 1965, and the other to a representative of Southwest Industrial Properties, Inc., dated July 29, 1965, are the primary source of information relevant to Maberry's conduct. In the letter to Julian, Maberry states that he *understands* the contract has been terminated and *if such is the case* no commission accrued. This letter leaves the fact of termination open to further development and conditioned non-accrual upon termination under the contract's option provision. Maberry's conduct reflected by the July 29th letter to Southwest Industrial Properties, Inc.'s representative is consistent with an

understanding that the sales contract was terminated; but is silent on termination. Neither letter is an expressed assertion or acknowledgment that the agreement had terminated. When both are considered the implication is that there was doubt in Maberry's mind that termination occurred, and that he reserved his rights under the contract unless it was later ascertained the contract in fact terminated. The letters do not constitute proof of termination.

In searching for the inferences to be drawn from Maberry's conduct, the familiar rule may be invoked that in business and social relations a person will be presumed to have acted honestly and properly, in the absence of contrary evidence.[c] Such an inference or presumption of fact does not satisfactorily close the gap in the proof in this instance. This results because an inference of fact drawn from a fact presumed is not sufficient to support a factual conclusion.[d] The presumption in this instance is that Maberry's act, or acts, accord with his obligation under the contract, but the question is whether or not Southwest Industrial Properties, Inc., chose to terminate the contract. From Maberry's act in returning the escrowed $25,000 check it may be presumed that Maberry acted properly, but an inference from his proper act that Southwest Industrial Properties, Inc., elected to terminate the contract is an inference drawn from a presumed fact and is insufficient to factually support a finding that Southwest Properties, Inc., did in fact exercise the option to terminate. Concisely, the second, the inference of termination rests upon the first, the presumption of Maberry's proper action; the second is a conclusion conjectural in nature reached by a reasoning process and not based upon proof.

Failure to prove termination as a matter of law in accordance with the special provision of the sales contract of February 10, 1965, necessitates a reversal of the summary judgment and remand to the trial court; it is so ordered.

d.  Texas Sling Company v. Emanuel, 431 S.W.2d 538 (Tex.1968); Fort Worth Belt Ry. v. Jones, 106 Tex. 345, 166 S.W. 1130 (1914); 23 Tex.Jur.2d Evidence, Secs. 68, 69. It should be noticed that text writers make no distinction between inference of fact and presumptions of fact, treating them as identical and distinguishable from true presumptions or what is commonly called presumptions of law. Wigmore on Evidence, Sec. 2490, 2491; McCormick and Ray, Texas Law of Evidence, Sec. 51; 23 Tex.Jur. Evidence, Sec. 65.