**Reversed and Remanded and Opinion Filed December 6, 2022**



**In the**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00632-CV**

**JENNIFER PARKS, INDIVIDUALLY AND AS GUARDIAN OF THE PERSON AND ESTATE OF SAMUEL RIVERA GAMA, AND NICOLASA GAMA DALE, Appellants**
**V.**
**FORD MOTOR COMPANY, Appellee**

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-03411-2021**

## MEMORANDUM OPINION

Before Justices Molberg, Partida-Kipness, and Carlyle
Opinion by Justice Carlyle

Samuel Rivera Gama and several others (collectively, plaintiffs or appellants) filed this products liability action against appellee Ford Motor Company after Mr. Gama was injured in a rollover accident involving his 2001 Ford Explorer Sport (the SUV). Ford moved for summary judgment based on the Texas products liability statute of repose. *See* TEX. CIV. PRAC. & REM. CODE § 16.012(b). The trial court granted Ford's summary judgment motion and ordered that plaintiffs take nothing

on their claims. We reverse and remand in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

## BACKGROUND

Following Mr. Gama's May 23, 2014 accident, plaintiffs filed this lawsuit on May 17, 2016.[1] They alleged the 2001 Ford Explorer Sport's defective design made it susceptible to rollovers and "the roof strength was such that it could not withstand reasonably foreseeable rollover crash forces." The petition stated that "[a]t some point after its manufacture, Ford sold [the SUV] in the stream of commerce" and thus became liable "for injuries or damages caused by or arising out of defects in the design, manufacture, or marketing of the subject vehicle." Plaintiffs' claims against Ford included strict liability and negligence.[2]

Ford filed a general denial answer and asserted several affirmative defenses, including that plaintiffs' claims are "barred by the applicable statute of repose." Additionally, following discovery, Ford filed a motion for summary judgment based on section 16.012(b), which requires a claimant to "commence a products liability action against a manufacturer or seller of a product before the end of 15 years after the date of the sale of the product by the defendant." TEX. CIV. PRAC. & REM. CODE § 16.012(b). Ford contended (1) the "date of the sale of the product" means "[t]he

---

[1] Though plaintiffs originally filed this case in Dallas County, venue was transferred to Collin County in February 2018 on Ford's motion.

[2] Plaintiffs also asserted additional claims against Ford and another defendant. Because the claims at issue here were subsequently severed from those claims, we do not address plaintiffs' additional claims in this opinion.

date that Ford exchanged the vehicle at issue for a price"; (2) the summary judgment evidence "conclusively shows that Ford exchanged the vehicle with an independent dealership, Town East Ford, for a price on the 'release date' of May 9, 2000"; (3) "[t]hat is the date that Town East Ford paid Ford for the vehicle, and Ford transferr[ed] ownership of the vehicle to Town East Ford"; and (4) plaintiffs "did not file suit within 15 years of May 9, 2000, the date that Ford sold the vehicle to Town East Ford." Ford also asserted that a recent federal court opinion supported its position as to that defense. *See Camacho v. Ford Motor Co.*, 993 F.3d 308 (5th Cir. 2021).

The evidence Ford relied on included, among other things, (1) a transcript of a December 9, 2020 deposition of Ford's U.S. sales strategy manager Michael O'Brien; (2) excerpts from Mr. O'Brien's May 29, 2019 deposition in *Camacho*; (3) a June 20, 2019 affidavit of Mr. O'Brien; (4) February 20, 2018 and September 13, 2019 affidavits of Ford design analysis engineer Robert Pascarella; (5) copies of the versions of Ford's "Sales and Service Agreement" and "Vehicle Terms of Sale Bulletin" in use between Ford and its independent dealerships in 2000; (6) a Ford "Mini 999 Report" regarding the SUV; and (7) a Ford "Vehicle Information Report" regarding the SUV.

Plaintiffs filed objections to the admissibility of Ford's summary judgment evidence asserting, among other things, that because Mr. O'Brien and Mr. Pascarella were "interested witnesses," their testimony could not support summary judgment

unless it was "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." *See* TEX. R. CIV. P. 166a(c). Plaintiffs contended this requirement was not met as to either witness.

Plaintiffs also filed a summary judgment response asserting "Ford cannot prove it sold the subject Explorer to Town East Ford [TEF] and/or when the sale took place." Plaintiffs argued, among other things, (1) even if deemed competent, Mr. O'Brien's December 9, 2020 deposition testimony "at best . . . raises a fact question for the jury to consider" because it "is contrary to his earlier affidavits" and testimony of other Ford corporate representatives and (2) *Camacho* is distinguishable in that the evidence here includes Ford affidavits and deposition testimony "which distinguish the act of releasing a vehicle to a dealership from the act of selling it," a distinction "not discussed in the Fifth Circuit opinion in *Camacho*."

The evidence attached to plaintiffs' response included (1) excerpts from Mr. Pascarella's and Mr. O'Brien's May 29, 2019 depositions in *Camacho*; (2) affidavits of Ford design analysis engineer William Ballard in two prior non-related lawsuits against Ford involving Ford vehicles; and (3) a March 2019 affidavit in which Dallas-area resident Charles Stewart stated he "leased" an SUV from Town East Ford "[f]rom June 30, 2000 through May 31, 2003" that "could be" the SUV in this case.

Ford filed a reply asserting, among other things, that under *Camacho*, the only material fact the trial court needed to consider was "when did defendant Ford Motor Company exchange the vehicle at issue for a price?" Ford contended the summary judgment evidence "conclusively demonstrates that happened on May 9, 2000, the date designated in Ford's records as the 'release date,'" and "[t]here is no genuine issue of fact on this point."

The trial court signed a May 13, 2021 order granting Ford's motion for summary judgment and dismissing plaintiffs' products liability claims.

Then, Ford filed a response to plaintiffs' above-described evidentiary objections. Ford argued (1) "O'Brien's testimony leaves no doubt: Ford exchanged the subject vehicle with independent dealership Town East Ford for a price (i.e., Ford 'sold' the vehicle under the statute of repose) on the 'release date' of May 9, 2000"; (2) "Ford's other summary judgment evidence shows the same thing"; (3) "[o]n that date, Town East Ford paid Ford for the subject vehicle, and Ford released it to the carrier, transferring ownership to Town East Ford"; and (4) "Plaintiffs failed to generate any evidence disproving the fact that on May 9, 2000, Ford 'sold' the vehicle to Town East Ford."

In their reply to that response, plaintiffs contended, among other things:

> Although it is Ford's burden to support its summary judgment motion with competent evidence, it attempts to shift the burden to the Plaintiffs in discussing, for example, Michael O'Brien and claiming the Plaintiffs had their chance to controvert his testimony but failed for lack of trying. Ford completely overlooks the fact that the Plaintiffs did

–5–

controvert Ford's evidence by pointing out the inconsistencies and contradictions in and between the testimony of Ford's corporate representatives and in Ford's own documents and pleadings. . . . [I]f Ford's evidence fails then its motion fails. Plaintiffs have no burden to offer contrary evidence.

Additionally, as to Ford's reliance on *Camacho*, plaintiffs asserted,

[U]nlike in Texas state courts, there are no restrictions in federal courts on the use of 'interested witness' testimony in summary judgment proceedings. This is not an insignificant issue since Ford's summary judgment evidence, in this case, is based entirely on the testimony of interested witnesses, and their interpretation of Ford's internal documents which themselves are internally inconsistent.

The trial court signed a June 23, 2021 order overruling plaintiffs' evidentiary objections. After the claims at issue were severed, plaintiffs timely filed this appeal.

### STANDARD OF REVIEW AND APPLICABLE LAW

We review a summary judgment de novo. *Trial v. Dragon*, 593 S.W.3d 313, 316 (Tex. 2019). A traditional motion for summary judgment requires the moving party to show that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). We take evidence favorable to the nonmovant as true, and we indulge every reasonable inference and resolve every doubt in the nonmovant's favor. *Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 131 (Tex. 2019); *see Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965) ("If the motion involves the credibility of affiants or deponents, or the weight of the showings or a mere ground of inference, the motion should not be

granted."). If the movant satisfies its burden, the burden shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *Lujan*, 555 S.W.3d at 84.

"A summary judgment may be based on uncontroverted testimonial evidence of an interested witness . . . if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." TEX. R. CIV. P. 166a(c); *see Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990) (per curiam) (stating that to establish entitlement to summary judgment as matter of law, "the evidence from an interested witness must not be contradicted by any other witness or attendant circumstances and the same must be clear, direct and positive, and free from contradiction, inaccuracies and circumstances tending to case suspicion thereon"). Interested witness testimony that does not meet Rule 166a(c)'s requirements "does no more than raise a fact issue." *Ragsdale*, 801 S.W.2d at 882; *see also Hunsucker v. Omega Indus.*, 659 S.W.2d 692, 697 (Tex. App.—Dallas 1983, no writ) (employee of party is "interested witness").

"[W]hile statutes of limitations operate procedurally to bar the enforcement of a right, a statute of repose takes away the right altogether, creating a substantive right to be free of liability after a specified time." *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 866 (Tex. 2009) (citing *Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 261 (Tex. 1994)); *see Fed. Deposit Ins. Corp. v.*

*Lenk*, 361 S.W.3d 602, 609 (Tex. 2012) (unlike statute of limitations, statute of repose "runs from a specific date without regard to the accrual of a cause of action"). "When a defendant moves for summary judgment based on an affirmative defense, such as the statute of repose, the defendant, as movant, bears the burden of proving each essential element of that defense." *Lenk*, 361 S.W.3d at 609.

The Texas products liability statute of repose provides that a claimant "must commence a products liability action against a manufacturer or seller of a product before the end of 15 years after the date of the sale of the product by the defendant." TEX. CIV. PRAC. & REM. CODE § 16.012(b). A "products liability action" means any action against a manufacturer or seller for recovery of damages or other relief for harm allegedly caused by a defective product, whether the action is based in strict tort liability, strict products liability, negligence, . . . or any other theory or combination of theories." *Id*. § 16.012(a)(2).

APPLICATION OF LAW TO FACTS

**The summary judgment evidence**

***Sales and Service Agreement between Ford and dealers***

Section 11 of Ford's Sales and Service Agreement in effect in 2000 stated in relevant part:

> ***TERMS AND TITLE***
> **11. (a) *Payment*.** Payment by the Dealer for each COMPANY PRODUCT shall be in accordance with the terms and conditions set forth in the applicable VEHICLE or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN.

**11. (b)** *Title.* Title to each COMPANY PRODUCT purchased by the Dealer shall (unless otherwise provided in the applicable VEHICLE or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN) pass to the Dealer or to such financing institution or other party as may have been designated to the Company by the Dealer, upon delivery thereof to the carrier or to the Dealer, whichever occurs first, but the Company shall retain a security interest in and right to repossess any product until paid therefor.

### Vehicle Terms of Sale Bulletin between Ford and dealers

Ford's Vehicle Terms of Sale Bulletin in effect in 2000 stated in relevant part:

A. Prices and Charges
The Dealer shall pay the Company for each VEHICLE and factory-installed option thereon sold to the Dealer the Wholesale Delivered Price thereof including any charges for taxes and handling as specified in the Ford Division Passenger Car and Truck Price Lists and supplements thereto (Price Lists), plus the Company's charges for distribution and delivery applicable to the Dealer as specified in notices, as furnished to the Dealer by the Company and in effect on delivery of the VEHICLE to the Dealer or the carrier, whichever occurs first, subject to any price adjustment provided for on the invoice.
. . . .
D. Payment
Payment for each VEHICLE purchased by the Dealer shall be made in cash unless the invoice or other Company notice provides otherwise, in which event the terms of the invoice or other notice shall govern. Receipt of any check, draft or other commercial paper shall not constitute payment until the Company shall have received cash in the full amount thereof. The Dealer shall pay all collection charges.

### Ford's reports regarding the SUV

Ford's Mini 999 Report regarding the SUV displayed data from Ford's records that included a "Release" date of May 9, 2000; an "Orig Release" date of May 9, 2000; a "Shipped" date of May 12, 2000; a "Sales" date of June 8, 2000; and

–9–

a "Warranty Sale" date of June 8, 2000. Under the heading "Name Cocar Leasee," the Mini 999 Report stated "CWStewart Jr."

Ford's Vehicle Information Report regarding the SUV described a "Production Date" of May 8, 2000; a dealer "Arrival Date" of May 12, 2000; and a "Sale Date" of June 7, 2000.

### *Mr. Pascarella's testimony*

The record shows Mr. Pascarella testified as follows in his February 20, 2018 affidavit in this case:

> 3. . . . Some of the information collected and maintained by Ford is information regarding the factory build date of the vehicle, the date that the vehicle was released, the date the vehicle shipped, the date that the vehicle arrived at the dealership, and the date that the vehicle was sold by the dealership. Two reports that Ford may generate from its databases that reflect this information are the Vehicle Information Report and the Mini 999 Report.
> . . . .
> 5. Based on Ford's business records regarding the vehicle at issue, as reflected in the attached Vehicle Information Report, the vehicle was built by Ford at its Louisville Plant with a production date of May 8, 2000. The Vehicle Information Report further reflects that the vehicle was delivered to a dealer on May 12, 2000. Additionally, the Vehicle Information Report reflects that the vehicle was sold by Ford dealer Town East Ford to a customer on June 7, 2000, and Ford's warranty coverage for the vehicle accordingly began that same day.
> . . . .
> 7. Based on Ford's business records regarding the vehicle at issue, as reflected in the attached Mini 999 Report, the vehicle was produced on May 9, 2000, and the vehicle was released on May 9, 2000. The date of release is the date that is on or near when the vehicle leaves Ford's possession, custody, and control. The Mini 999 Report further reflects that the vehicle was shipped on May 12, 2000. As also shown in the Vehicle Information Report, the Mini 999 Report indicates that the

vehicle was sold by the dealership on June 8, 2000.

. . . .

9. In summary, based on my knowledge of Ford's recordkeeping practices in regard to its vehicles, and the information based on those records reflected in [the Vehicle Information Report and the Mini 999 Report], the manufacture of the 2001 Ford Explorer Sport at issue was completed by Ford on or about May 8, 2000; it left Ford Motor Company's possession, custody, and control on or about May 9, 2000; and it was sold by Ford dealer Town East Ford to a retail buyer on or about June 7, 2000.

Except for the dates and locations described, Mr. Pascarella's testimony in his affidavit was identical to Mr. Ballard's testimony in his two affidavits in prior lawsuits against Ford.

In his May 29, 2019 deposition in *Camacho*, Mr. Pascarella testified:

Q. Mr. Pascarella, do you understand we're here today to take Ford's deposition on what the corporation knew relating to certain matters in the notice involving its defense that the case was not filed within 15 years of the first sale of the truck?
A. I guess there was some discussion with counsel about the statute of repose. I'm not a lawyer but specifically I would be asked to speak on behalf of Ford regarding certain aspects of documents basically from the point of production to the point of sale.
. . . .
Q. . . . A lease is not a sale; right?
A. I guess I don't even understand the definitions. I know I don't get the title when I lease a vehicle.
. . . .
Q. Do you have any idea what the definition of a sale of a motor vehicle is in Texas?
A. If there's some specific—no, I don't. If there's some specific law or definition, no, I don't.
. . . .
Q. So in terms of the documents that you're here to discuss, whatever is stated in those documents relating to a sale, you don't know what Ford's definition is of a first sale?

A. In terms of a first sale, I do not. I just know the terms in the reports and documents that are the subject of the topics I was going to discuss. I know what all those terms mean and where the information comes from. That's what I did to prepare.

. . . .

Q. All right. What is a Vehicle Information Report?

A. It is a report generated through the AWS system that summarizes basic information about the vehicle.

Q. What is the Ford AWS system?

A. The analytical warranty system.

. . . .

Q. I'm just asking from the Vehicle Information Report, is there any data reported that shows a sale or lease by Ford to the dealer as compared to some consumer?

A. To the dealer—to the dealer subject in this case, there's only—the only information contained about that is when it arrived to the dealer and when the dealer reported it sold.

. . . .

Q. All right. And what is the purpose of the Mini 999 Report for Ford?

A. It's just a basic summary of certain vehicle information such as model year, plant code, vehicle ordering, the VOC information, which, with the right decoder, you can figure out what options are on a vehicle, certain dealer codes, assembly plant information, financial data, name and address data. . . .

. . . .

Q. Okay. Now is there anything in the Mini 999 Report that states a sale from Ford to the dealer?

A. Yes.

Q. What?

A. Up in the AAD, where you see the release date of 10/6/03.

Q. All right. So this document states "Release," R-e-l-e-a-s-e, and underneath it it has a date of 10-06-03; right?

A. Correct.

Q. It doesn't state "sale"?

A. It does not.

Q. It doesn't state "Sale 10-6-03"; right?

A. It does not.

Q. It doesn't say anywhere on this document sale from Ford to a dealer, true?

A. Correct.

Q. Now, what is Ford's definition of release? As I tend to think of that, release means let go, like you would catch a fish and release it.

A. That's the point where the vehicle through the system was —the date the vehicle was shipped from wherever Ford had the vehicle to the dealer, and that's when essentially payment is due from the dealer for those vehicles.

. . . .

Q. Now, is it Ford's contention that it uses a different definition for release that encompasses sale? In other words, release doesn't mean let go; it means sale too?

A. Well, I guess when I review the documentation, release was basically the point that it was shipped and the point in time that the dealer would pay Ford Motor Company for the vehicle.

Q. I'm talking about release. I'm not talking about the separate notation of shipped that has a different date of 6/27 of 2003. Do you see that?

A. I'm telling you what release means in terms of this document. It means the point that the vehicle was shipped from that location to the dealer, and then you see the convoy reported, and it basically arrived at the dealer on 10/16/03, but the definition of release in this document, that is a point in time the dealer is supposed to provide payment, similar to if you buy something. That's when you buy something, whether it's even Amazon, you buy it and then they ship it.

Q. Okay.

A. They don't ship it usually before you buy it.

. . . .

Q. . . . When was the payment made in full?

A. I don't know, other than based on the system the release date is the date the dealer is responsible for payment of the vehicle.

. . . .

Q. Okay. So basically for your testimony on behalf of Ford, you're testifying that release means the date that the dealership needs to pay Ford for the truck?

A. Well, it's a combination. That's the date that the vehicle is basically going to be shipped from that place where it is, and at that point in time is when payment is due.

. . . .

Q. . . . Let's go to [the February 20, 2018 Pascarella affidavit in *Parks v. Ford*]. [Y]ou said based on your employment, you have personal knowledge as to the —I mean, the Vehicle Information Report and the mini reports; right?

A. Correct.

–13–

. . . .

Q. So in terms of the first sale in [the *Parks v. Ford* case], you testified that the document said that the first sale in that case was the dealer to the consumer under oath, under penalty of perjury?

A. I did.

. . . .

Q. No testimony about any release or sale date of the vehicle from Ford to the dealership in the Parks case, right?

A. That's correct.

Q. Now, you indicated the ship date, but still no testimony that the vehicle was sold on its release or ship date, even though you referenced shipping dates, right?

A. Correct.

. . . .

Q. So as you sit here today, based on your review of all the documents that we've gone through . . . you don't know whether the vehicle was sold to the dealership or not; right?

A. They paid Ford for it in some way. How that transaction takes place, I don't know.

Q. Okay. You don't know whether a sale was consummated, though, as a sale is defined?

A. That's probably a legal term. That's correct, I don't know.

Q. You don't know what Ford's definition of sale is?

A. Only in the terms of the Vehicle Information Report and the Mini 999 in terms of what's reported as a sale from the dealer that we talked about.

Q. And that definition of sale includes leases and sales?

A. I don't know. I guess it could.

Q. And you don't know when the first sale of this vehicle was in terms of a date? Your testimony of Ford, you don't know when the first sale was?

A. I know reported sale from the dealer, when that date is; that's what I know. What exactly the legal terms for that sale is, you're right, I don't know.

Several months later, in a September 13, 2019 "supplemental" affidavit in this case, Mr. Pascarella stated, among other things, "In 2000 (and today), when Ford

–14–

sold and released a vehicle to the dealership, the 'Release Date' is recorded at that time."

### *Mr. O'Brien's testimony*

Mr. O'Brien testified in his May 29, 2019 deposition in *Camacho* as follows:

Q. . . . Is there any reported sale date on the Mini 999 from Ford to the dealership?
A. Yes.
Q. What is stated?
A. It is stated as release.
Q. What does release mean to you?
A. It means released to the carrier for delivery.
Q. Let go?
A. Yeah.
Q. Okay. And is that the definition Ford uses for release, to let go, relinquish?
A. We release it to the carrier, and so the vehicle was turned over to the carrier. I don't know—"let go" doesn't quite seem to fit, but it is— changes possession from Ford to the dealer at the time we hand it off to the carrier.
Q. So "release" as stated in the mini, is defined by Ford to mean that the vehicle is released from Ford to the dealership?
A. To the carrier for delivery to the dealership, correct, and the dealer obtains ownership at that point.
. . . .
Q. Does Ford have a definition of sale of the vehicle?
A. Yes.
Q. What is Ford's definition of sale?
A. We have two definitions. One is what we would call the wholesale, from Ford to the dealer, and as I've already stated, that happens at the time the vehicle is released to the carrier, and then the dealership then reports to us when the vehicle was sold to an end user, typically a retail customer or fleet or something like that. . . .
. . . .
Q. All right. And then I want to go through a couple of other things while we have the Mini 999 out. You talked about the release date earlier today as being 10/6/03; is that right?
A. Correct.

Q. Is the release date the same day that Ford sells the vehicle to the dealership?

A. Yes.

Q. And what actually takes place during that transaction?

A. Theoretically the dealer could pay in cash, but then what happens in reality is the dealer has a floor plan source that they have provided to us, and said [sic] any vehicle that I purchase should be, we call it, drafted against that floor plan source. It's kind of like a line of credit, and if it's a $30,000 vehicle, it takes—it would take 30,000 from the line of credit to pay for the vehicle at the time it's released.

Q. So does Ford receive payment for the vehicle on the release date?

A. Yes.

　　　[Counsel for plaintiffs]: Objection. Form.

Q. [by Counsel for Ford] And does the—does Ford give possession and control and ownership of the vehicle to the dealership?

A. Sort of. I mean, we give possession and control to the carrier, but it is in the ownership of—the dealer is the owner at that point.

. . . .

Q. And the word ["sale"] does not appear on the documents as far as wholesale date goes, at least with respect to the Mini 999 we're looking at, correct?

A. Correct.

Q. But there is a release date.

A. Yes.

Q. And does the release date always coincide with the wholesale date?

A. Yes.

In his June 20, 2019 affidavit in this case, Mr. O'Brien stated:

3. . . . Some of the information collected and maintained by Ford is information regarding the factory build date of the vehicle, the wholesale date of the vehicle by Ford to the dealership, the date the vehicle shipped, the date that the vehicle arrived at the dealership, and the date that the vehicle was sold by the dealership.

. . . .

5. Based on Ford's business records regarding the vehicle at issue, the vehicle [in this case] was built by Ford at its Louisville Plant with a production date of May 9, 2000, which was the date the vehicle left the production line.

6. Further, based on Ford's business records regarding the vehicle at issue, the release date, May 9, 2000, is the date the vehicle was sold by Ford to a dealership. Ford receives payment for the vehicle on the release date. Further, pursuant to the agreement between Ford and the dealership, ownership of the vehicle passes from Ford to the dealership at the time the vehicle is released and/or delivered to the carrier, i.e. the "release date." Ford also considers the release date as the wholesale date. Thus, the release date is the date the vehicle leaves the possession, custody, and control of Ford. Finally, after the release date, because Ford no longer owns the vehicle, Ford would not, nor could it, lease the vehicle to a consumer.

In his December 9, 2020 deposition in this case, Mr. O'Brien testified:

Q. At what point in the life of the vehicle does Ford sell the vehicle to a dealership?
A. So, if you can envision the vehicle getting built, when it's done being built at the end of the assembly line, it is at that point released to the carrier, and the release to the carrier is the trigger point in which the dealership pays us for the vehicle and the vehicle becomes what is essentially sold to the dealer.
Q. So my next question was going to be what happens in that transaction, in that sale; can you go into a little more detail on that?
A. Yeah. So when the vehicle is released to the carrier, the dealership is required to pay us money for the vehicle. As I alluded to earlier, that's typically done through a financial institution. They often have a line of credit with a bank, for example, and so we draft that bank on that simultaneous with it being released to the plant, from the plant, excuse me, and that then becomes—we get our money and the dealer takes ownership of the vehicle during that transaction.
Q. Okay. Is every vehicle sold the same way?
A. Yes.
Q. And was it the same way in the year 2000?
A. Yes.
Q. Are there any documents that set forth this process?
A. Yes.
Q. Is the Sales and Services Agreement one of them?
A. Yes.
. . . .
Q. What is the release date for the [SUV] that's listed on this Mini 999?
A. May 9th of 2000.

–17–

Q. Does that mean on May 9th of 2000, Ford sold [the SUV] to a dealership?
A. Yes.
Q. And did so by accepting money from the dealership, receiving money from the dealership, and transferring ownership to the dealership?
A. Correct.

## Analysis

In two issues, appellants contend (1) the trial court was precluded from granting summary judgment in Ford's favor based on the statute of repose because "the contradictions and inconsistencies in Ford's summary-judgment evidence violate[d] the preconditions for interested-witness testimony in TEX. R. CIV. P. 166a(c)" and (2) "the trial court abuse[d] its discretion in overruling Plaintiffs' objections to the admissibility of Ford's contradictory and inconsistent interested-witness testimony based on Rule 166a(c)." Because we decide appellants' first issue in their favor, we do not reach their second issue.[3]

The parties assert, and we agree, that in this case the relevant "sale" for section 16.012(b) purposes is a sale of the SUV by defendant Ford, as opposed to a sale by an independent dealer. Thus, the date of a sale by Ford is the triggering date for

---

[3] To the extent Ford contends appellants entirely "waived their 'interested witness' appeal" by not properly preserving their admissibility objections, we disagree that preservation of those objections was required in order to challenge the summary judgment here. Even where testimony is properly considered as summary judgment evidence, it cannot form the basis for a summary judgment if it does not meet Rule 166a(c)'s requirements. *See Kazmir v. Suburban Homes Realty*, 824 S.W.2d 239, 244 (Tex. App.—Texarkana 1992, writ denied); *see also Ragsdale*, 801 S.W.2d at 882 (interested witness testimony that does not meet Rule 166a(c)'s requirements "does no more than raise a fact issue").

section 16.012(b)'s 15-year period as to plaintiffs' claims in question. *See Lenk*, 361 S.W.3d at 609.

Ford contends (1) "there is only *one* material fact germane to the summary judgment: the 'date of the sale' of the vehicle by Ford under the products liability statute of repose"; (2) on the release date, "Ford receives payment from the dealer, and Ford in turn releases the vehicle to the dealer for shipment and delivery"; and (3) "[t]he testimony of the Ford employees on the 'date of the sale' is consistent, clear, and uncontroverted." According to Ford, the evidence "established the 'date of sale' of the vehicle by defendant Ford, under Texas' 15-year products liability statute of repose, was May 9, 2000" and appellants "failed to controvert O'Brien's and Pascarella's testimony on this one material fact with evidence that Ford exchanged the vehicle with the dealership for a price on some other, later, date."

Though appellants do not challenge *Camacho*'s conclusion that "sale" means "the transfer of property or title for a price," *see Camacho*, 993 F.3d at 312, they dispute Ford's assertion that it conclusively established that it "exchanged the 2001 Explorer Sport with dealership Town East Ford for a price on the 'Release' date of May 9, 2000." Appellants argue Ford "does not and cannot account for the conflict between its witnesses' testimony that the purchase price for a vehicle is *always* paid on the release date, and its documents proving that the purchase price often *is not paid* until long after the release date." Additionally, appellants contend Ford could not "simply choose a date outside the 15-year window," but instead "had to prove

–19–

that it—not the dealer—actually made a sale on the chosen date." According to appellants,

> Ford's evidence about the [SUV's] date of release . . . provides the factfinder with no information about whether, or when, payment for that vehicle was ever made. Payment might have been made on the date of release. Payment also might have been made after the release date and inside the 15-year window—if the dealer paid late. And if the dealer defaulted, then payment might not have been made at all. That leaves Ford with no clear, consistent, and conclusive evidence of the date of payment, and therefore no evidence of the date of an alleged sale.

The record shows Mr. Pascarella originally stated the "release" date "is the date that is on or near when the vehicle leaves Ford's possession, custody, and control." He subsequently testified (1) the release date is "the date that the vehicle is basically going to be shipped from that place where it is, and at that point in time is when payment is due," and (2) he could not tell from a Mini 999 Report when "payment was made in full," "other than based on the system the release date is the date the dealer is responsible for payment of the vehicle." Several months later, in his "supplemental" affidavit in this case, Mr. Pascarella stated, "In 2000 (and today), when Ford sold and released a vehicle to the dealership, the 'Release Date' is recorded at that time." Thus, his testimony is unclear and inconsistent as to whether a "release" can occur prior to payment. *See* TEX. R. CIV. P. 166a(c).

Though Mr. O'Brien testified Ford "receives payment for the vehicle on the release date" and "the release date always coincide[s] with the wholesale date," he stated his testimony that "the release date, May 9, 2000, is the date the [SUV] was

sold by Ford to a dealership" was "based on Ford's business records," including "the agreement between Ford and the dealership." To the extent Ford asserts Mr. O'Brien's testimony shows payment was made on May 9, 2000, because Ford "always" receives payment on the release date, the Sales and Service Agreement and the Vehicle Terms of Sale Bulletin both appear to allow for other payment arrangements and thus demonstrate contradictions and inconsistency as to that testimony. *See* TEX. R. CIV. P. 166a(c); *see also Ortiz*, 589 S.W.3d at 131 (explaining that courts reviewing summary judgments must indulge every reasonable inference and resolve every doubt in nonmovant's favor). Though Ford states in its appellate brief that it tried, but was unable, to "get corroborating information on the Ford-to-dealer sale [of the SUV]," we agree with appellants' assertion that they "had no obligation to obtain information that Ford itself could not obtain for a defense on which Ford had the burden of proof."

Additionally, Ford asserts *Camacho* supports its position because the Fifth Circuit held in that case that "'the sale of the product by the defendant' happened . . . when Ford released the truck to the dealership." *See Camacho*, 993 F.3d at 313. We disagree. The Fifth Circuit stated, "According to Ford's Sales and Service Agreement with the dealership and the undisputed testimony of Ford's sales strategy manager, ownership passed to the dealership when Ford released the truck for the price of $25,725.23. All elements of the sale were therefore established." *Id*. The Fifth Circuit also stated, "And, in any event, Ford's representatives did testify

–21–

that the 'release' is a 'sale.'" *Id*. Not only is *Camacho* not binding on this Court, but it also is distinguishable in that (1) it involved evidence pertaining to the particular truck sale before that court and (2) because it was a federal case, Rule 166a(c)'s interested witness testimony requirements were not applied. We do not find *Camacho* instructive.

On this record, we conclude Ford did not conclusively establish the "date of the sale" from which section 16.012(b)'s claimed protection ran, and thus, the trial court erred by granting summary judgment in Ford's favor based on its statute of repose defense. *See* TEX. R. CIV. P. 166a(c); *see also Lenk*, 361 S.W.3d at 609 (defendant moving for summary judgment based on statute of repose bears burden of proving each essential element of defense).

We reverse the trial court's order granting Ford's motion for summary judgment based on the statute of repose and remand this case to the trial court for further proceedings consistent with this opinion.


210632f.p05

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

–22–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JENNIFER PARKS,
INDIVIDUALLY AND AS
GUARDIAN OF THE PERSON
AND ESTATE OF SAMUEL
RIVERA GAMA, AND NICOLASA
GAMA DALE, Appellants

No. 05-21-00632-CV     V.

FORD MOTOR COMPANY,
Appellee

On Appeal from the 429th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 429-03411-
2021.
Opinion delivered by Justice Carlyle.
Justices Molberg and Partida-Kipness
participating.

In accordance with this Court's opinion of this date, the trial court's order granting summary judgment based on the statute of repose is **REVERSED** and this cause is **REMANDED** to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellants JENNIFER PARKS, INDIVIDUALLY AND AS GUARDIAN OF THE PERSON AND ESTATE OF SAMUEL RIVERA GAMA, AND NICOLASA GAMA DALE recover their costs of this appeal from appellee FORD MOTOR COMPANY.

Judgment entered this 6th day of December, 2022.